**LATIN AMERICAN MUSIC CO., INC., et al.,**

v.

**ARCHDIOCESE OF SAN JUAN OF THE ROMAN CATHOLIC AND APOSTOLIC CHURCH, et al.**

No. CIV.96–2312 (PG).

United States District Court,
D. Puerto Rico.

April 18, 2001.

Edgardo L. Rivera-Rivera, Jorge A. Fernandez-Reboredo, San Juan, PR, Eugenio C. Romero, Hato Rey, PR, Freddie Perez-Gonzalez, San Juan, PR, Angel N. Caro-Padilla, Trujillo, PR, for Latin American Music Co., Asociacion De Compositores Y Editores De Musica Latinoamericana(ACEMLA).

Francisco A. Besosa, Adsuar, Muniz, Goyco & Besosa, San Juan, PR, for Southern Music Publishing Co., Peermusic Ltd., Sonido, Inc., FAF Publishing, EMI Catalogue Partnership, Broadcast Music, Inc., Peer International Corp.

Roberto Sueiro-Del-Valle, San Juan, PR, for Turabo Radio Corp., ARSO Radio Corp., WNEL-AM, WTVA-FM, El Mundo Broadcasting Corp., WKAQ-FM, Prime Media Broadcasting Group, Inc., WZNT-FM, Isabela Broadcasting Co., Kelly Broadcasting System, BESTOV Broadcasting, HQ-FM 103, Inc., AERCO Broadcasting Corp., Tommy Muniz Productions, Inc., VI-MAN Broadcast System Corp., Sensacion Broadcasting Corp.

Alfredo Fernandez-Martinez, Hato Rey, PR, Maria E. Rodriguez-Lopez, Guaynabo, PR, for Archdiocese of San Juan of Roman Catholic & Apostolic Church.

Alfredo Raffucci-Carrion, San Juan, PR, Edelmiro Salas-Garcia, San Juan, PR, for Ramon Rodriguez & Associates, Inc., WCFI-FM.

Rodrigo Otero-Bigles, Otero Suro & Otero Suro, San Juan, PR, for ABG Realty & Investment Corp.

Eugenio C. Romero, Hato Rey, PR, Luis Raul Bernard, San Juan, PR, pro se.

Diego A. Ramos-Cayon, Fiddler, Gonzalez & Rodriguez, San Juan, PR, Richard H. Reimer, New York City, for American Society of Composers, Authors, and Publishers(ASCAP).

## AMENDED OPINION & ORDER

PEREZ–GIMENEZ, District Judge.

Before the Court is Third-party Defendant American Society of Composers' ("ASCAP") Motion for Summary Judgment (Dkt.97), Co-defendants Latin American Music Company, Inc.'s ("LAMCO") and ACEMLA de P.R., Inc.'s ("ACEMLA") Motion for Partial Summary Judgment (Dkt.98), and the oppositions to those motions by each of the respective parties (Dkts. 110 & 109). At issue in this copyright infringement case is five (5) of more than four-hundred (400) songs: (1) "Caballo Viejo" by Simón Díaz; (2) "Patacón Pisa'o" by Ramon A. Chaverra; (3) "Ojos Chinos" by Rogelio "Kit" Vélez; (4) "Te Sigo Quieriendo" by Luz C. Tirado; and (5) "Una Tercera Persona" by Luz C. Tirado.

The Court proceeds to determine ownership of each of the at-issue songs before proceeding, when applicable, with LAMCO's and/or ACEMLA's ("LAMCO/ACEMLA") copyright infringement claims.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). A fact is material, if under applicable substantive law, it may affect the result of the case and a dispute is genuine only if there is conflicting evidence that requires a trial to resolve the discrepancy. *See Ortega–Rosario v. Alvarado–Ortiz,* 917 F.2d 71, 73 (1st Cir.1990). Once the movant has presented probative evidence establishing its entitlement to judgment, the party opposing the motion must set forth specific facts demonstrating that there is a material and genuine issue for trial. *See id.; Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether summary judgment is warranted, the court views the facts alleged in the light most favorable to the non-moving party and must indulge all inferences in favor of that party. *See Rossy v. Roche Products, Inc.,* 880 F.2d 621, 624 (1st Cir. 1989).

"Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment per se. *See Wiley v. American Greetings Corp.,* 762 F.2d 139, 141 (1st Cir.1985). Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. *See id.*" *Wightman v. Springfield Terminal Ry. Co.,* 100 F.3d 228, 230 (1st Cir.1996).

Cross-motions for summary judgment are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist. If any such issue exists it must be disposed of by a plenary trial and not on summary judgment. *See Rains v. Cascade Industries, Inc.,* 402 F.2d 241, 245 (3d Cir.1968). *See also Redman v. Warrener,* 516 F.2d 766, 768 & n. 2 (1st Cir.1975); 6 J. MOORE, MOORE'S FEDERAL PRACTICE ¶ 56.13 (2d ed. 1981) ("The well-settled rule is that cross-motions for summary judgment do not warrant the court in granting summary judgment unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed.") (footnotes omitted).

*Wiley v. American Greetings Corp.,* 762 F.2d at 140–41.

### FACTS

ASCAP is an unincorporated New York membership association with more than 80,000 members who write and publish musical compositions. Typically, each member grants to ASCAP a nonexclusive license to authorize public performances of the member's copyright music. On behalf of its members, ASCAP then licenses the right to perform publicly all of the hundreds of thousands of copyrighted songs in the ASCAP repertory. ASCAP's licensees include television networks and stations, radio networks and stations, restaurants, nightclubs, hotels, as well as other music users.

LAMCO is a New York corporation having as its principal place of business in the Bronx, New York. LAMCO is a music publishing company that also, at times, functions as a music performing rights organization.

ACEMLA is a performing rights organization, organized and existing under the laws of Puerto Rico. ACEMLA's principal place of business is Hato Rey, Puerto Rico.

ASCAP entered this case due to the claimed-licenses to the following radio stations to perform works in the ASCAP repertory: The Archdiocese of San Juan of the Roman Catholic and Apostolic Church b/d/a WORO–FM and WKVM–AM; Isabela Broadcasting Co. d/b/a WKSA–FM and WISA–AM; Bestov Broadcasting System Corp. d/b/a WIAC–AM and WIAC–FM; and AERCO Broadcasting Corp. b/b/a WQBS–AM.[1] The agreements between ASCAP and the radio stations provide that ASCAP will defend claims brought against compositions covered by those agreements.

## CABALLO VIEJO

On September 29, 1981, Selemúsica, C.A., a Venezuelan music publisher, contracted with Simón Díaz to obtain the rights in certain of Mr. Díaz's songs, including "Caballo Viejo." The contract granted Selemúsica the power to license the performance rights in "Caballo Viejo" throughout the world. Subsequently, Selemúsica executed agreements with West Side Music Publishing, Inc., ("West Side") a predecessor-in-interest of Barnegat Music Corp. ("Barnegat"), granting West Side the right to represent Selemúsica in the United States and its territories (including Puerto Rico). The agreements identified Caballo Viejo as one of the works to be exploited by West Side. Selemúsica applied for and obtained a copyright registration certificate (PA 186–131; date of publication January 12, 1981) for "Caballo Viejo" listing Selemúsica as copyright claimant effective August 16, 1983.

West Side first granted certain rights (including the right to collect performing

rights royalties) to Barnegat, and then effectively merged the two entities into a single business. Barnegat has been an ASCAP member since 1984.

On May 15, 1981, West Side entered into an agreement with LAMCO whereby the former transferred to the later the exclusive rights to publish and license performance and phonomechanical rights to "Caballo Viejo" in the United States and Puerto Rico. LAMCO recorded the May 15, 1981 transfer of exclusive rights from West Side to LAMCO regarding all musical compositions contained in the Selemúsica repertory with the Register of Copyrights on December 17, 1986.

On December 2, 1986, the Copyright Royalty Tribunal found that "Caballo Viejo" was "allegedly transferred to West Side Music Publishing, Inc., which in turn [was] assigned to ACEMLA, but the registration certificates only show West Side Publishing as an addressee for correspondence, and that Selemúsica, C.A. is the copyright owner. [ASCAP and the other parties] showed that Selemúsica, C.A. conveyed its rights to Barnegat Music, Corp., an ASCAP member." *Final Determination of the Distribution of the 1984 Jukebox Royalty Fund,* Dkt. No. 85–1–84JD, 51 FR 43455–01, 1986 WL 116931 (Copyright Roy. Trib. Dec. 2, 1986), *aff'd,* 835 F.2d 446 (2d Cir.1997).

On January 3, 1982, West Side entered into an Exclusive Performing Rights Assignment Agreement with LAMCO granting all exclusive rights to license in the United States, Puerto Rico and the Domin-

---

**1.** The ASCAP–Radio Station license grants to each radio station licensee "a license to perform publicly by radio broadcasting [as part of the licensee's radio program] non-dramatic performances of the separate musical compositions in the 'Society's Repertory'." The "Society's Repertory" "means all musical compositions which the Society has the right to license for public performance now or

hereafter during the term of this agreement. Included for the full term of this agreement are all compositions written and copyrighted by members of Society and in the repertory on the date this agreement is executed. Compositions later written or copyrighted by members during the license term shall be included for the full balance of the term."

ican Republic, the public performance of all music and compositions titles contained in the West Side repertory. The May 15, 1981 assignment agreement between West Side and LAMCO was for a specific term of five (5) years. West Side ultimately orally terminated the May 1981 Agreement in 1986. The subsequent January 3, 1982 Exclusive Performing Rights Assignment Agreement between West Side and LAMCO appears to have had no term limitation.

## PATACÓN PISA'O

Ramon A. Chaverra, then a resident of Cartagena, Columbia, wrote the song "Patacón Pisao" sometime in 1984. On February 3, 1984, Chaverra entered into an agreement by which he conveyed his copyright rights to a Colombian music publisher, Prodemus. Also in February 1984, Prodemus and Música Unica Publishers entered into a separate agreement by which Prodemus conveyed to Música Unica Publishers the right to represent Prodemus as its subpublisher in the United States and Puerto Rico. This agreement gave Música Unica Publishers (also known as "Música Unica Publishing"), among other rights, the right to authorize, and to authorize others, to license the right to perform "Patacón Pisa'o" in the United States and Puerto Rico. Subsequently, Música Unica Publishers applied for and obtained a copyright registration certificate, PA 262010, effective September 17, 1985.

On September 23, 1985, Chaverra, entered into an agreement with Edinmúsica, LTD in Cartagena, Colombia, transferring all title and licensing authority to the phonomechanical and performing rights of the musical work "Patacón Pisa'o", as interpreted by Johnny Ventura, in the United States, Puerto Rico, Panama and Venezuela to Edinmúsica. The transfer agreement was duly authenticated in accordance to Section 204 of the Copyright Act. On June 2, 1986, Edinmúsica and LAMCO jointly filed and registered with the Register of Copyrights the words and music to "Patacón Pisa'o"and other musical works of Ramón A. Chaverra.

On September 7, 1994, Chaverra notified Edinúsica in writing of the termination of the September 23, 1985 transfer agreement. On September 9, 1994, Chaverra and LAMCO entered into two (2) separate agreements transferring to LAMCO the exclusive rights to publish and transferring to ACEMLA (LAMCO's performance rights organization) the non-exclusive right to collect performance royalties in reference to "Patacón Pisa'o" and other musical compositions for a period of ten (10) years in the United States. These agreements were the subject of two (2) separate recordations with the Register of Copyrights on November 21, 1994.

ASCAP has asserted a non-exclusive right to collect performance royalties related to "Patacón Pisa'o." From March 1, 1983 on Unimusica, Inc. has been a member of ASCAP. The membership agreement grants ASCAP the right to license public performances of Unimúsica works, including "Patacón Pisa'o," in the United States and Puerto Rico. ASCAP asserts that although the U.S. copyright for the song "Patacón Pisa'o" is in the name of Música Unica Publishing, it is one of many works covered by the agreement between ASCAP and Unimusica, Inc., because "Música Unica Publishing" is a fictitious trade name of Unimusica, Inc. and, therefore, Música Unica Publishing works are deemed to be in the ASCAP repertory.

## OJOS CHINOS

Rogelio ("Kito") Velez wrote the song "Ojos Chinos" sometime before November 29, 1963. On that date, Mr. Velez and Southern executed an agreement pursuant to which Mr. Velez transferred all of his rights, title and interest in the song "Ojos Chinos" to Southern Music Publishing Co.,

Inc. ("Southern"). The agreement authorized Southern to apply for the copyright in the work and to renew the copyright in the work. Pursuant to the Velez–Southern agreement, Southern applied for and received two copyright registration certificates from the Copyright Office for two separate published versions of the song "Ojos Chinos": EP 186619 (date of publication, March 23, 1964), effective April 14, 1964 and EP 317280 (date of publication, August 25, 1972), effective October 11, 1975. On or about July 1, 1992, Southern applied for a copyright renewal registration certificate for "Ojos Chinos," to which the U.S. Copyright Office issued a renewal registration certificate dated July 6, 1992, RE 587946, to Southern.

Because Mr. Velez had died prior to Southern's obtaining of the renewal copyright certificate, Southern sought and obtained an assignment of the renewal rights from Mr. Velez's widow, Paula Montalvo Vda. De Velez and his children.

On March 28, 1994, the heirs of Kito Velez granted ACEMLA a worldwide non-exclusive license, during a specified term of ten (10) years, to collect performing royalties on approximately thirty (30) music titles composed by Velez. This license agreement and its accompanying documents specifically included "Ojos Chinos." ACEMLA recorded the agreement with the Register of Copyrights on July 8, 1994.

**UNA TERCERA PERSONA**

Luz Celenia Tirado wrote the song "Una Tercera Persona" in 1968. On November 20, 1968, Ms. Tirado and Southern executed an agreement pursuant to which Ms. Tirado transferred to all of her rights, title and interest in the song "Una Tercera Persona" to Southern. The agreement authorized Southern to apply for the copyright in the work and to renew the copyright in the work. Pursuant to the Tirado–Southern agreement, Southern applied for and received a copyright regis-

tration certificate EP 255172 (date of publication, December 19, 1968) from the Copyright Office for the published version of the song "Una Tercera Persona," effective February 6, 1969.

On June 6, 1996, Southern executed an assignment of the renewal rights in "Una Tercera Persona" from Luz Celenia Tirado to Southern. The assignment of renewal rights granted Southern the power to act as her attorney-in-fact in renewing the copyright. On June 11, 1996, using their power-in-fact authority, Southern obtained a copyright renewal registration certificate for "Una Tercera Persona" in the name of Luz Celenia Tirado. The U.S. Copyright Office issued a renewal registration certificate dated June 11, 1996, RE 734–098, to Southern. Southern is a long time member of ASCAP.

Through an agreement dated December 2, 1980, Luz Celenia Tirado transferred to LAMCO the copyright ownership of approximately 153 music titles including "Una Tercera Persona." LAMCO recorded the transfer with the Register of Copyright on February 8, 1985. On December 26, 1984, LAMCO filed for the registration of the music and words to "Una Tercera Persona."

**TE SIGO QUERIENDO**

Luz Celenia Tirado wrote the song "Te Sigo Queriendo" in 1968. On December 17, 1968, Ms. Tirado and Southern executed an agreement pursuant to which Ms. Tirado transferred all of her rights, title and interest in the song "Te Sigo Queriendo" to Southern. The agreement authorized Southern to apply for the copyright in the work and to renew the copyright in the work. Pursuant to the Tirado–Southern agreement, Southern applied for and received copyright registration certificate EP 261303 (date of publication, July 14, 1969) from the Copyright Office for the published version of the song "Te Sigo Queriendo," effective July 29, 1969.

On June 13, 1997, Southern executed an assignment of the renewal rights in "Te Sigo Queriendo" from Luz Celenia Tirado to Southern, employing the power to act as her attorney-in-fact pursuant to the Tirado–Southern agreement. On June 20, 1997, Southern obtained a copyright renewal registration certificate for "Te Sigo Queriendo"in the name of Luz Celenia Tirado. The U.S. Copyright Office issued a renewal registration certificate dated June 20, 1997, RE 759–802, to Southern.

On September 25, 1986, Luz Celenia Tirado entered into a supplemental agreement transferring to LAMCO the copyright ownership of additional music titles authored by the composer and including specific reference to "Te Sigo Queriendo." On February 23, 1990, LAMCO filed for the registration of the music and words to "Te Sigo Quieriendo."

## APPLICABLE COPYRIGHT LAW

Copyright is a form of protection provided by the United States Constitution to the authors of "original works of authorship," including literary, dramatic, musical, artistic, and certain other intellectual works. This protection is available to both published and unpublished works. Section 106 of the 1976 Copyright Act generally gives the owner of copyright the exclusive right to do and to authorize others to do the following: (1) to reproduce the work in copies or phonorecords; (2) to prepare derivative works based upon the work; (3) to distribute copies or phonorecords of the work to the public by sale or other transfer of ownership, or by rental, lease, or lending; (4) to perform the work publicly, in the case of literary, musical, dramatic, and choreographic works, pantomimes, and

motion pictures and other audiovisual works; (5) to display the copyrighted work publicly, in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work; and (6) in the case of sound recordings, to perform the work publicly by means of a digital audio transmission. *See* 17 U.S.C. § 106 (Supp.2000). It is illegal for anyone to violate any of the rights provided by the copyright law to the owner of copyright.[2]

■ In order to prevail in a copyright infringement action, LAMCO must establish (1) authorship of the songs in question; (2) ownership of copyrights; (3) compliance with the statutory requirements to obtain copyrights; (4) unauthorized; and (5) public performance. *See Pedrosillo Music, Inc. v. Radio Musical, Inc.*, 815 F.Supp. 511, 514 (D.P.R.1993). "A determination of ownership is a conclusion of law based on underlying facts. 3 NIMMER [ON COPYRIGHT] § 13.01[A]." *Motta v. Samuel Weiser, Inc.*, 768 F.2d 481, 484 (1st Cir.1985).

## REGISTRATION

Copyright protection begins when an author creates a work by fixing it in a tangible medium of expression. The registration of the copyright is a legal formality. Only in certain circumstances is registration a requirement to obtain copyright protection. Of importance in this case is when works were copyrighted. For works published between January 1, 1964 and January 1, 1993, renewal of the copyright is automatic and copyright cannot be lost for failure to register and renew.[3] *See* 17 U.S.C. § 304(a) (Supp.2000).

---

**2.** These rights, however, are not unlimited in scope. Sections 107 through 121 of the 1976 Copyright Act establish limitations on these rights. These limitations do not apply to the current case.

**3.** Each of the songs at issue was copyrighted between January 1, 1964 and January 1, 1993.

Though generally permissive, registration confers important advantages on the registrant. Included in these advantages are (1) registration establishes a public record of the claim of copyright; (2) it secures the right to file an infringement suit; (3) it establishes *prima facie* validity of the copyright; (4) it makes available a broader range of remedies for an infringement suit, allowing recovery of statutory damages and attorney's fees; and (5) only if registration is made will recordation of a document in the Copyright Office give constructive notice of the facts stated in the recorded document.[4]

A plaintiff bears the burden of proving that they own the copyrights in an infringement action. The registration certificate gives the presumption of the satisfaction of the statutory formalities. Likewise, the chain of title from the author to the person that obtained an assignment of rights prior to registration may also be presumed from the registration certificate. The person thus needs only to show the registration and evidence of his or her chain of title from the original copyright registrant to establish *prima facie* ownership. *See* 4 Melville B. Nimmer & David Nimmer, Nimmer On Copyright § 13.01[A]. When an assignee of the copyright (either common law or statutory) first registers a claim of statutory copyright in his name and obtains a certificate of registration in his name that constitutes *prima facie* evidence of the validity of his copyright and of the facts stated therein, the opposing party has the burden of controverting assignee's chain of title.

Several of the songs before the Court implicate both the 1909 Act and the 1976 Act. Prior to the 1976 Act taking effect on January 1, 1978, the 1909 Act controlled copyright law in the United States. In 1976, Copyright law received an overhaul, introducing several changes. Some of the more important aspects of the 1976 Act include the preemption of common law copyright, extending the term of copyright, a change in the requirement of formalities (which was further altered by the Berne Convention Implementation Act of 1988 ("BCIA")), and ownership.

Both the 1909 Act and the provisions of the 1976 Act as originally enacted remain relevant for several reasons. Of importance in this case is that the 1976 Act specifically incorporates provisions of the 1909 Act and also retains standards developed through case law decided under the 1909 Act, such as the standards for originality and copyright infringement.[5] The Court therefore fuses the 1976 Act and its predecessor, the 1909 Act, along with several of the more recent alterations, into its discussion.

Section 209 of the 1909 Act stated that the copyright certificate of registration "shall be admitted in any court as *prima facie* evidence of the facts stated therein." 3 Nimmer On Copyright § 9.06[D][2]. Section 410(c) of the 1976 Copyright Act pro-

---

4. To register the claimant must send three elements in the same envelope to the Register of Copyrights: (1) a properly completed application form; (2) a non-refundable fee for each application; and (3) a deposit copy of the work to be registered. Copyright registration is effective on the date of receipt in the Copyright Office of all the required elements in acceptable form.

5. It is partly because of this overlapping and interweaving that copyright law can be a maze to both practitioners and courts. "A copyright scholar has a complicated task-to be conversant with the provisions of the 1909 Act, the 1976 Act as originally enacted, and subsequent amendments to the 1976 Act, and also to be able to determine which piece of legislation is applicable in a particular situation." Marshall Leaffer, Understanding Copyright Law § 1.5[D] (2d ed.1995).

vides: "In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court." The significant difference between these two provisions is that the *prima facie* effect of registration was achieved under the 1909 Act whenever registration occurred, whereas under the current Act, it is limited to those registrations that occur before, or within five years after, first publication of the work. *See* 3 NIMMER ON COPYRIGHT § 12.11[A].

Both § 411(a) of the current Act and § 13 of the 1909 Act require registration before "an action or proceeding ... for infringement of copyright" can be pursued. By reason of § 412, in order for a copyright owner to be entitled to recover statutory damages and attorney's fees, the work must have been registered prior to commencement of the infringement for which such remedies are sought. "Commencement" of the infringement means "the time when the first act of infringement in a series of ongoing discrete infringements occur." The benefits of avoiding United States Registration are slight compared to the costs associated with not registering-notably giving up attorney's fees, statutory damages and the *prima facie* presumption of copyright validity. *See id.* § 7.16[b][1][b].

Works could obtain statutory copyright protection under the 1909 Act, without the necessity of registration. Under the 1909 Act, copyright protection could be obtained by publishing copies of the work bearing a proper copyright notice. In this way, registration did not create the copyright, but merely recorded it. *See id.* § 7.16[A][2][a]. Section 109 of the Transi-

tional and Supplementary Provisions of the current Act, as construed in the House Report states: "Several provisions of the bill, including sections 205(c)(2), 205(d), 152 405(a)(2), 406(a)(1), 406(a)(2), 411, and 412, prescribe registration or recordation as a prerequisite for certain purposes. Where the work involved is covered by a subsisting copyright when the new law becomes effective, it is intended that any registration or recordation made under the present [1909] law would satisfy these provisions." *Id.* at § 7.16[D]. Under the 1976 Act, copyright registration is not necessary for the copyright to be protected. *See Everts v. Arkham House Publs., Inc.*, 579 F.Supp. 145 (D.Wis.1984) (registration is irrelevant to the existence of copyright protection under either the 1909 or 1976 Acts). However, registration is a prerequisite to an infringement action, although it may be obtained at any time during the copyright term.

**TRANSFER AND/OR ASSIGNMENT OF OWNERSHIP**

█ The general rule is that a prior transferee takes priority over a subsequent transferee if the prior transferee properly recorded in the Copyright Office prior to the subsequent transferee recording in the Copyright Office. *See* NIMMER ON COPYRIGHT § 10.07[A][1][a]. However, a search of Copyright Office records is just the starting point for an investigation into who owns which rights in a given work. *See Jim Henson Productions, Inc. v. John T. Brady & Associates, Inc.*, 16 F.Supp.2d 259 (S.D.N.Y.1997). Although transfers of copyright are normally made by contract, the Copyright Office does not have any forms for such transfers and although recordation is not required to make a valid transfer between the parties, it does provide certain legal advantages and may be required to validate the transfer as against third parties. *U.S. Copyright Office's Transfer of Copyright Section of Circular 1–Copyright Basics, http://loc.gov/copy-*

*right/circs/circl.html* (U.S. Copyright Office, as of July 20, 2000).

■ Stated more precisely, under the 1976 Act a prior transferee always prevails over a subsequent transferee if the prior transferee properly recorded in the Copyright Office prior to the subsequent transferee's recordation, and the work in question has been registered. *See* NIMMER ON COPYRIGHT § 10.07[A][1][a]. However, the prior transferee does not automatically forfeit the copyright simply because the subsequent transferee recorded first in time.[6] *See id.* If the prior transferee fails to register and record before the subsequent transferee (and within the statutory grace period), then the subsequent transferee *may* prevail. *See id.* In this instance, the subsequent transferee must clear several hurdles to prevail: the subsequent transferee (1) must be without notice; (2) must have paid valuable consideration; and (3) must have duly recorded his or her transfer before recordation of the prior transfer. *See id.*

Under the 1909 Act, if the prior transferee did not record within the three (3) month grace period, he or she would not prevail against a subsequent transferee who did record within the applicable grace period (assuming the subsequent transferee had no notice of the prior transfer and paid a valuable consideration). *See* 3 NIMMER ON COPYRIGHT § 10.07[A][1][b].

Under the 1976 Act, even if a prior transferee fails to record, and indeed even if the prior transferee never records his transfer, he will still prevail as against a subsequent transferee who takes with notice of the prior transfer. *See Rytvoc, Inc. v. Robbins Music, Corp.,* 289 F.Supp. 136 (S.D.N.Y.1967). Section 30 of the 1909 Act also required that the subsequent transfer-

ee be "without notice." Section 205(d) of the 1976 Act added that the transfer be "taken in good faith" as well as "without notice." 3 NIMMER ON COPYRIGHT § 10.07[A][2]. The term "notice" in the 1976 Act's § 205(d) and 1909 Act's § 30 includes actual notice, inquiry notice, and constructive notice. *See id.* "[C]onstructive and presumed[, also known as inquiry,] notice or knowledge are equivalent to knowledge. So, when [a party] has notice or information to put a reasonable person on inquiry, or has the opportunity to obtain knowledge from sources open to his investigation (such as public records or corporation books)," he or she is held to have notice. *General Bedding Corp. v. Echevarria,* 947 F.2d 1395, 1397 (9th Cir. 1991). Actual notice is a legal question which may pose difficult questions of proof as to whether a subsequent transferee possessed actual knowledge of a prior transfer. Inquiry or presumed notice is generally a question for a jury that hinges on all the attendant facts. *See id.*

The presence or absence of good faith is also a question for the jury. Good faith entails "not only honesty in fact, but reasonableness as well." *Quinto v. Legal Times of Washington, Inc.,* 506 F.Supp. 554, 562 (D.D.C.1981). *See also In re AEG Acquisition Corp.,* 127 B.R. 34, 43–44 (C.D.Cal.1991), *aff'd,* 161 B.R. 50 (1993) ("a later transfer of an interest in a copyright qualifies for priority only if the transferee has been honest in fact[, i.e., acted in "good faith",] in the transaction at issue, and has also met each of the other qualifications"). A defendant must make a "good faith" effort to avoid copyright infringement. *See Olan Mills, Inc. v. Linn Photo Co.,* 23 F.3d 1345, 1348 (8th Cir.1994). " 'Good faith' is an ancient concept in the

---

**6.** It is here where the statutory grace periods come into play-three months under the 1909 Act and either one (within the United States) or two (outside the United States) months

under the 1976 Act. The grace period allows a short window for the prior transferee to record and still maintain priority.

law, normally equated with 'honesty of intention', *In Re Johnson*, 708 F.2d 865, 868 (2d Cir.1983), and acting 'equitably', *In Re Goeb*, 675 F.2d 1386, 1390 (9th Cir.1982)." *American Home Assur. Co. v. Baltimore Gas & Elec. Co.*, 1987 WL 4928, at *5 n. 3 (S.D.N.Y.1987), *aff'd*, 845 F.2d 48 (2d Cir. 1988). Even where the defendant believes in good faith that he is not infringing a copyright, he may be found liable. *See County of Ventura v. Blackburn*, 362 F.2d 515 (9th Cir.1966). More than simple "innocence" is required.

To summarize, under the 1909 Act, a failure to record an assignment rendered it void only as against "any subsequent purchaser or mortgagee for a valuable consideration without notice, whose assignment has been duly recorded." 17 U.S.C. § 30 (1909 Act). Under the Copyright Act of 1976 as initially enacted, the obligation to record a transfer applied to any case in which the plaintiff was someone other than the author. In such circumstances, the plaintiff must first record in the Copyright Office "the instrument of transfer" under which the plaintiff asserts ownership of the rights allegedly infringed. Having thus recorded, suit may thereafter be brought for causes of action that arose prior to, as well as after, such recordation.[7] The foregoing rule continues to apply to all decennial infringement actions, i.e., all actions alleging infringement from the effective date of the current Act, January 1, 1978, until its amendment by the BCIA, March 1, 1989. As to infringements occurring after March 1, 1989, however, the BCIA eliminates this prerequisite, with respect to both American and foreign claimants. The 1909 Act *did not require* recordation

of transfers. *See* 3 NIMMER ON COPYRIGHT § 12.08.

Current law does not differentiate between an assignment and a license as prior law had. Under the 1909 Act, this distinction was an important one. An assignment carried the entire copyright to a person (a "proprietor"). A license carried less than the entire copyright (e.g., only the right to publicly perform a musical composition). Only the name of the proprietor could be placed in the copyright notice and only a proprietor could bring an action for copyright infringement. The 1976 Act reformed this concept by considering a person who holds an exclusive license to publicly perform the work the "owner." Thus, what is now important is whether the license is exclusive or non-exclusive.

Transfers of copyright that are executed outside the United States require no special rules. However, under § 204(b), foreign transfers that are accompanied by a certificate of acknowledgment issued by a diplomatic or consular officer of the United States or a person authorized to administer oaths, the certificate of acknowledgment is *prima facie* evidence of the execution of transfer.[8]

**RENEWAL**

Under the 1909 Act, works copyrighted in the United States prior to January 1, 1978, were subject to a renewal system in which the term of copyright was divided into two consecutive terms. Renewal registration, within strict time limits, was required as a condition of securing the second term and extending the copyright to its maximum length.[9] On January 1, 1978,

---

7. This, of course, does not determine ownership.

8. This is not to say that an assignment or transfer unaccompanied by a certificate of acknowledgment is not entitled to *prima facie*

weight. *See In Design v. Lauren Knitwear Corp.*, 782 F.Supp. 824, 829 (S.D.N.Y.1991).

9. Copyright can be transferred inter vivos or upon death from the author or initial copyright owner, and transferred again.

the current copyright law came into effect in the United States. This law retained the renewal system for works that were copyrighted before 1978 and were still in their first terms on January 1, 1978. For these works the statute provided for a first term of copyright protection lasting for 28 years, with the possibility for a second term of 47 years. The 1992 amending legislation automatically secures this second term for works copyrighted between January 1, 1964, and December 31, 1977. *See U.S. Copyright Office's Renewal of Copyright of Circular 15, http://loc.gov/ copyright/circs/circ15.html* (U.S. Copyright Office, as of July 20, 2000). The term of copyright in works copyrighted between January 1, 1964, and December 31, 1977, is now 95 years. There is no requirement to register a renewal in order to extend the original 28–year copyright term to the full term of 95 years. Although the renewal term is secured automatically, the Copyright Office does not issue a renewal certificate for these works unless a renewal application and fee are received and registered in the Copyright Office.

When the copyright owner transfers rights in the renewal term and survives until renewal vesting, then rights in the renewal term belong to the assignee. *See* 3 NIMMER ON COPYRIGHT § 9.06[B]. An assignment of the right to renewal copyright executed by an author prior to the vesting of such renewal right will upon such vesting be binding upon the author, so that thereafter the assignee and not the author will be entitled to such renewal. Several courts have held that as long as the renewal application is filed in the name of a person entitled to such renewal, the application may actually be filed by any person authorized by the proper claimant to do so. *See Rose v. Bourne, Inc.,* 279 F.2d 79 (2d Cir.), *cert. denied,* 364 U.S. 880, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960); *Rossiter v. Vogel,* 134 F.2d 908 (2d Cir.1943); *Good-*

*man v. Lee,* 815 F.2d 1030, 1031 n. 2 (5th Cir.1987).

However, if the author (or transferor of the renewal expectancy) passes away before the renewal rights vest, then those persons who by statute succeed to the renewal rights are not bound by any assignment (or transfer) executed by the deceased. *See* 3 NIMMER ON COPYRIGHT § 9.06[C]. In other words, death extinguishes the renewal rights of the assignee.

Under the 1976 Act

"[a]n assignment by an author of his renewal rights made before the original copyright expires is valid against the world, if the author is alive at the commencement of the renewal period. *[Fred] Fisher Co. v.[M.] Witmark & Sons,* 318 U.S. 643 [63 S.Ct. 773], so holds." *Id.,* 362 U.S., at 375, 80 S.Ct. 792, [ ]. If the author dies before that time, the "next of kin obtain the renewal copyright free of any claim founded upon an assignment made by the author in his lifetime. These results follow not because the author's assignment is invalid but because he had only an expectancy to assign; and his death, prior to the renewal period, terminates his interest in the renewal which by § 24 vests in the named classes."

*Stewart v. Abend,* 495 U.S. 207, 219, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990). In relation to the 1909 Act, the Supreme Court held that

"[t]he right of renewal is [likewise] contingent. It does not vest until the end [of the original term]. If [the author] is alive at the time of renewal, then the original contract may pass it, but his widow or children or other persons entitled would not be bound by that contract." 5 Legislative History of the 1909 Copyright Act, Part K, p. 77 (E. Brylawski & A. Goldman eds.1976) (statement of Mr. Hale). Thus, the renewal provi-

sions were intended to give the author a second chance to obtain fair remuneration for his creative efforts and to provide the author's family a "new estate" if the author died before the renewal period arrived.

*Id.* at 219–20, 110 S.Ct. 1750.

Both certificates were required as a condition of renewal. But by virtue of the Copyright Renewal Act of 1992, different considerations govern works from 1964 through 1977. Now, the renewal term subsists automatically, even if neither an original nor a renewal application has ever been filed with the Copyright Office.

## DISCUSSION

"The challenge of copyright is to strike the 'difficult balance between the interests of authors and inventors in the control and exploitation of their writings and discoveries on the one hand, and society's competing interest in the free flow of ideas, information, and commerce on the other hand.' *Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 429, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984)." *Harper and Row Publs., Inc. v. Nation Enterps.,* 471 U.S. 539, 580, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). Timing plays a major role in this case, for two (2) of the songs were created under the 1976 Act ("Caballo Viejo" and "Patacón Pisa'o") while three (3) were created under the 1909 Act ("Ojos Chinos," "Una Tercera Persona," and "Te Sigo Queriendo"). Because of Copyright Law's nature, the latter three (3) songs are controlled by both the 1909 Act and the 1976 Act (as well as the amendments to the 1976 Act that have followed). The Court begins its discussion with the two (2) songs created under the 1976 Act, "Caballo Viejo" and "Patacón Pisa'o," before discussing the remaining three (3) songs which were created under the 1909 Act, "Ojos Chinos," "Una Tercera Persona," and "Te Sigo Queriendo."

## 1. "CABALLO VIEJO"

Simón Díaz wrote the song, "Caballo Viejo, sometime in 1980 and published it on January 12, 1981. Selemúsica obtained a copyright for the song on August 16, 1983. For purposes of this dispute, neither side contests that Selemúsica contracted with Díaz to gain the rights to "Caballo Viejo." The parties also agree that Selemúsica entered into agreements with West Side which granted West Side the right to represent Selemúsica in the United States and its territories. According to West Side Cofounder Hector Varona, the right to represent the song "Caballo Viejo" was the main reason West Side formed in the first place. Rather, the parties dispute the chain of title.

For its part, LAMCO asserts ownership based upon an agreement between West Side and ACEMLA (LAMCO's performing rights organization) in 1982. LAMCO and West Side entered into a previous agreement on May 15, 1981 whereby West Side granted LAMCO the exclusive rights to publish and license performance and phonomechanical rights to "Caballo Viejo" for a period of five (5) years. This agreement was recorded on December 17, 1986 with the Register of Copyrights, almost two weeks *after* the Copyright Royalty Tribunal had determined that the rights to "Caballo Viejo" belonged to ASCAP. To escape the same result, LAMCO now contends that the second agreement does not contain any time limit and therefore must continue perpetually.

To combat this allegation, ASCAP introduced the deposition of Varona. In his deposition, Varona repeatedly says that he verbally ended the 1982 agreement with ACEMLA and never accepted any of the payments sent him. A portion of Varona's deposition, taken December 2, 1998, is illustrative.

44

Q. And you agree with [LAMCO] that there is no specified term of this agreement; is that correct?

A. That's correct.

Q. Nevertheless, is it your belief that this agreement is still in effect?

A. As far as I'm concerned, no.

Q. Do you recall the last time, if there was a last time, that you did receive any payments from either Latin American Music or ACEMLA with respect to Caballo Viejo?

A. He [Bernard] made some—well I don't know if you can call it payments or sent some checks, which it was never cashed by us or deposited by us. I don't—the exact date, I can, you know, I can find out because we have the record in there in the office. And the reason why those checks were not deposited is because if these payments were never accompanied by royalty statement—in other words, we cannot tell what money is for such song, where it comes from, etc.

Q. As best as you can place the time, would this have been within the last two or three years?

A. Oh, no, no.

Q. Five years?

A. Five years or maybe even longer.

Varona Deposition at 84–85.

Over the years, LAMCO tried several times to have West Side extend the 1981 agreement and confirm West Side's allegiance to them. These attempts were unsuccessful, as Varona's deposition points out. Included among ASCAP's exhibits are unsigned solicitory contracts and inquisitory letters sent by LAMCO and its representatives to West Side. The correspondence makes clear that West Side did not believe that they were under a continuing agreement with LAMCO. On the contrary, West Side indicated consistently that the agreement ended and there was it was under no contractual obligation whatsoever to LAMCO. The rejection of the so-called "royalty payments" further supports this view.[10]

After reviewing the evidence, the Court concludes that Simón Díaz contracted with Selemúsica, who contracted with West Side, who contracted with Barnegat, who is a member of ASCAP. The Court therefore agrees with the Copyright Royalty Tribunal and decides that the chain of title, for the narrow purpose of this motion, belongs to ASCAP for the song "Caballo Viejo."

## 2. "PATACÓN PISA'O"

■ Chaverra wrote "Patacón Pisa'o" in 1984 and as such it falls under the dominion of the 1976 Act. Chaverra conveyed the rights to "Patacón Pisa'o" to the Columbian music publisher Prodemus in February of 1984. That same month, Prodemus conveyed to Música Unica Publishers the right to represent Prodemus as its subpublisher in the United States and Puerto Rico. Música Unica, in turn, obtained a copyright registration certificate for "Patacón Pisa'o" on September 17, 1985. Unimúsica (a fictitious trade name for Música Unica) and ASCAP entered into a membership agreement which gave ASCAP the right to authorize licensees to give public performances of Chaverra's song.

On February 28, 1985, Edimúsica named LAMCO as its "music catalogue adminis-

---

**10.** If LAMCO did indeed strike a long-term deal with West Side and failed to pay royalties due under the contract, West Side could either rescind the contract or seek damages for breach. The Court finds it material that West Side did neither. This inaction by West Side and the want of royalty payments by LAMCO is further evidence that no contract continued between the two entities.

trator representative" in the United States (with the exception of two other administrators), the Dominican Republic and Puerto Rico. But it was not until September 23, 1985 that Chaverra assigned the Johnny Ventura-recorded version of "Patacón Pisa'o" to Edimusica. LAMCO and Edimúsica jointly obtained a copyright registration certificate "Patacón Pisa'o" on June 2, 1986.

On September 7, 1994, Chaverra terminated by letter the September 23, 1985 agreement with Edimúsica because he had not received payments for the works listed in the September 23, 1985 agreement (including "Patacón Pisa'o"). On September 13, 1994, Chaverra signed an Affidavit attesting that LAMCO is "the only entity that has ever represented and that presently represents my interest." The Affidavit also served to form part of Chaverra's alleged new assignment to LAMCO/ACEMLA. This affidavit was recorded on November 21, 1994 by LAMCO, along with a September 9, 1994 agreement between Chaverra and LAMCO. On November 23, 1994, ACEMLA recorded a separate September 9, 1994 agreement with Chaverra which purportedly gave ACEMLA the right to license certain, unspecified titles.

While it appears from the documents that ASCAP has priority of ownership over "Patacón Pisa'o,"one issue remains which precludes any decision. The 1983 agreement between Unimúsica and AS-CAP grants ASCAP the "right to license the public performance of every [ ] musical work" that Unimúsica now has or acquires during the term of the agreement.[11] *See* ¶ 1 of March 1, 1983 Agreement Between Unimúsica and ASCAP. Therefore, AS-CAP has priority through the 1983 Agreement, the 1984 Chaverra Agreement with Prodemus, and the 1984 agreement between Prodemus and Music Unica (Unimusica). A copyright registration certificate creates a presumption of ownership which must be overcome by the opposing party. However, while the copyright was registered by Música Unica, the agreement was never recorded. LAMCO's claim to ownership is based upon the November 21, 1994 recorded agreement. Chaverra's affidavit by itself cannot void the 1984 agreement between Chaverra and Prodemus, which granted Prodemus the exclusive right over "Patacón Pisa'o" in "Todo el Mundo," i.e., throughout the world.

LAMCO is the first to record. Yet, even if LAMCO had any claim over "Patacón Pisa'o" before the recorded agreement, a conclusion in dispute based upon Chaverra's unambiguous termination letter of September 7, 1994, it still must be shown that LAMCO took without notice, in good faith, and for valuable consideration. This

---

**11.** Paragraph 1. of the Agreement between Unimúsica (*Owner*) and ASCAP (*Society*) states:

The *Owner* grants to the *Society* for the term hereof, the right to license non-dramatic public performances (as hereinafter defined), of each musical work:
 Of which the *Owner* is a copyright proprietor; or
 Which the *Owner*, alone, or jointly, or in collaboration with others, wrote, composed, published or owned; or
 In which the *Owner* now has any right, title, interest or control whatsoever, in whole or part; or

Which hereafter, during the term hereof, may be written, composed, acquired, owned, published or copyrighted by the *Owner*, alone, jointly or in collaboration with others; or
 In which the *Owner* may hereafter, during the term hereof, have any right, title, interest or control, whatsoever in whole or in part.
The right to license the public performance of every such musical work shall be deemed granted to the Society by this instrument for the term hereof, immediately upon the work being written, composed, acquired, owned, published or copyrighted.

is so because ASCAP is a first-in-time transferee who did not record. Yet, the execution and recording of a copyright assignment by LAMCO/ACEMLA cannot create a legal ownership that did not already exist. *See Rose v. Bourne, Inc.,* 176 F.Supp. 605, 610 (S.D.N.Y.1959), *aff'd,* 592 F.2d 651, 655 (2d Cir.1978). Therefore, LAMCO/ACEMLA must clear several hurdles to prevail: the subsequent transferee (1) must be without notice and in good faith; (2) must have paid valuable consideration; and (3) must have duly recorded his or her transfer before recordation of the prior transfer.

While the presence or absence of "good faith" is an issue of fact for a jury, constructive notice may be determined at the summary judgment stage as an issue of law. "A copyright registration certificate issued by and filed with the Copyright Office serves to put the world on constructive notice as to the ownership of the copyright and the facts stated in the registration certificate." *Saenger Org. v. Nationwide Ins. Lic. Assocs., Inc.,* 119 F.3d 55, 66 (1st Cir.1997). *See Epoch Prod. Corp. v. Killiam Shows, Inc. et al.,* 522 F.2d 737, 740 n. 2 (2d Cir.1975), *cert. denied,* 424 U.S. 955, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976) (stating that registration records the claim of ownership). LAMCO/ACEMLA thus had constructive notice of the ownership of "Patacón Pisa'o" by Música Unica. Furthermore, Musica Unica's "chain of title from the author is presumed by reason of the registration certificate where [a party] obtained an assignment of rights prior to registration. 4[ ] NIMMER ON COPYRIGHT, § 13.01[A]. In the instant case, [Música Unica] obtained an assignment of rights

from the author[ ] prior to registration." *Marobie–Fl, Inc. v. National Ass'n of Fire Equip. Distrib.,* 983 F.Supp. 1167, 1173 (N.D.Ill.1997). ASCAP submitted the agreement between Música Unica (d/b/a Unimúsica) and itself, thereby demonstrating its chain of title. LAMCO/ACEMLA did not disprove ASCAP's chain of title. The Court therefore finds that ASCAP has the right to license performances of "Patacón Pisa'o" and LAMCO/ACEMLA's claim against ASCAP cannot stand.

### 3. OJOS CHINOS

Kito Velez wrote "Ojos Chinos" in 1963 and it therefore falls under the control of the 1909 Act. On November 11, 1963, Velez assigned all of his rights, title and interest in "Ojos Chinos" to Southern. Southern obtained a copyright registration certificate in 1964. In 1992, Southern obtained a copyright renewal registration certificate. However, Velez had passed away prior to Southern renewing its copyright. Southern obtained renewal authorization from Velez' widow and children in 1997.[12] Southern is a long-time member of ASCAP.

The heirs of Velez executed an agreement granting ACEMLA the non-exclusive license of all performing rights to "Ojos Chinos" on March 28, 1994. This agreement was recorded on July 8, 1994. The dispute over "Ojos Chinos" thus turns on the attempted renewal of the copyright. The Court thus turns to § 304 of the 1976 Copyright Act.

The relevant portions of § 304 states:

(a) **Copyrights in their First Term on January 1, 1978**—(1)(A) any copyright, the first term of which is subsisting on

---

**12.** The basic rule is that author (the individual who created the renewable matter) has the right to renewal. If the author is living at the renewal period, the application must be filed in his or her name. If the author is no longer living at the renewal period, the Copyright Act, not state rules of testamentary or intestate succession, governs the eligibility of classes of persons entitled to the renewal copyright.

January 1, 1978, shall endure for 28 years from the date it was originally secured.

(1)(C) In the case of any other copyrighted work . . . -

(i) the author of such work, if the author is still living,

(ii) the widow, widower, or children of the author, if the author is not living,

* * *

shall be entitled to a renewal term and extension of the copyright in such work for a further term of 67 years.

(2)(B) At the expiration of the original term of copyright in a work specified in paragraph (1)(C) of this subsection, the copyright shall endure for a renewed and extended further term of 67 years, which—

(i) if an application to register a claim to such further term has been made to the Copyright Office within 1 year before the expiration of the original term of copyright, and the claim is registered, shall vest, upon the beginning of such further term, in any person who is entitled under paragraph (1)(C) to the renewal and extension of the copyright at the time the application is made; or

(ii) if no such application is made or the claim pursuant to such application is not registered, shall vest, upon the beginning of such further term, in any person entitled under paragraph (1)(C), as of the last day of the original term of copyright, to the renewal and extension of the copyright.

(3)(A) An application to register a claim to the renewed and extended term of copyright in a work may be made to the Copyright Office—

(i) within 1 year before the expiration of the original term of copyright by any person entitled under paragraph (1)(B) or (C) to such further term of 67 years; and

(ii) at any time during the renewed and extended term by any person in whom such further term vested, under paragraph (2)(A) or (B), or by any successor or assign of such person, if the application is made in the name of such person.

(B) Such an application is not a condition of the renewal and extension of the copyright in a work for a further term of 67 years.

(4) * * *

(B) If an application to register a claim to the renewed and extended term of copyright in a work is made within 1 year before its expiration, and the claim is registered, the certificate of such registration shall constitute prima facie evidence as to the validity of the copyright during its renewed and extended term and of the facts stated in the certificate. The evidentiary weight to be accorded the certificates of a registration of a renewed and extended term of copyright made after the end of that 1–year period shall be within the discretion of the court.

* * * * * *

(c) Termination of Transfers and Licenses Covering Extended Renewal Term.-

In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, by any of the persons designated by subsection (a)(1)(C) of this section, otherwise than by will, is subject to termination under the following conditions:

(1) In the case of a grant executed by a person or persons other than the author, termination of the grant may be

effected by the surviving person or persons who executed it . . . .

(2) Where an author is dead, his or her termination interest is owned, and may be exercised, as follows:

(A) the widow or widower owns the author's entire termination interest unless there are any surviving children or grandchildren of the author, in which case the widow or widower owns one-half of the author's interest;

(B) the author's surviving children, and the surviving children of any dead child of the author, own the author's entire termination interest unless there is a widow or widower, in which case the ownership of one-half the interest is divided among them.

In the present situation, both parties allege that they obtained permission from the heirs of Velez for renewal. ACEMLA signed an agreement with the heirs in March of 1994 and recorded this agreement on July 8, 1994. Southern obtained a copyright renewal registration certificate on June 8, 1992, after Velez had passed away. Southern signed exclusive rights agreements with the heirs of Velez throughout August of 1997 and recorded these agreements on August 26, 1997.

■ When Southern obtained its renewal during the 28th copyright year, Velez was no longer alive. Southern's renewal is therefore invalid because the right of renewal belonged to Velez' heirs and not ASCAP. *See* 17 U.S.C. §§ 304(a)(1)(C) & (c)(2)(A). "For registration in the 28th year of the original copyright term, the renewal claimant is the individual(s) or entity who is entitled to claim renewal copyright on the date the application is filed." *U.S. Copyright Office's Renewal of Copyright of Circular 15, http://loc.gov/copyright/circs/circ15.html* (U.S. Copyright Office, as of July 20, 2000) (emphasis excluded). Southern could not renew because it did not have the right to do so.

Velez' widow and children possessed that right.

■ On the other hand, ACEMLA obtained a worldwide non-exclusive license from the heirs and recorded but did not register this right. Three years after ACEMLA received its non-exclusive license, Southern obtained an assignment of rights from Velez' heirs. The Court therefore rules that LAMCO/ACEMLA cannot prevail on a copyright infringement case, yet may be entitled to the payments from the radio stations. Since LAMCO/ACEMLA's non-exclusive license came first in time (and was recorded first), Southern's assignment of rights must acquiesce to LAMCO/ACEMLA's non-exclusive license. Section 205(e) of the 1976 Act states:

A non-exclusive transfer, whether recorded or not, prevails over a conflicting transfer of copyright ownership if the license is evidenced by a written instrument signed by the owner of the rights licensed or such owner's duly authorized agent, and if-

(1) the license was taken before execution of the transfer; or

(2) the license was taken in good faith before recordation of the transfer and without notice of it.

17 U.S.C. § 205(e). The present case falls squarely under § 205(e)(1) and thus LAMCO/ACEMLA's claim of copyright priority must prevail. "[A]ny statutory beneficiary of the author can make a valid transfer or license of future renewal rights, which is completely binding if the author is dead and the person who executed the grant turns out to be the proper renewal claimant. Because of this, a great many contingent transfers of future renewal rights have been obtained from widows, widowers, children, and next of kin." Revision Notes and Legislative Reports 1976 Acts. Notes of Committee on the Judiciary, H.R. No. 94–1476. *See also Capano Music v.*

*Myers Music, Inc.,* 605 F.Supp. 692 (S.D.N.Y.1985) (If copyright assignor is not living when renewal rights vest, then those who succeed to the author's interest under the Copyright Act take free of any assignment made by deceased assignor, and assignee takes nothing.).

However, the Court has before it a strange situation. Southern originally registered the copyright in 1964. Velez, his heirs, nor LAMCO/ACEMLA ever registered the copyright. LAMCO/ACEMLA simply recorded the transfer of renewal rights from Velez' heirs. LAMCO/ACEMLA now seeks to use Southern's registration as the basis for standing to bring its copyright infringement case against the radio stations (indemnified by ASCAP, who is involved through Southern).

Although LAMCO/ACEMLA never registered any copyright renewal, it may pursue a copyright infringement claim based upon Southern's original registration.[13] *See* 17 U.S.C. § 411(a) (1976) & 17 U.S.C. § 13 (1909). While registration is not a prerequisite to a valid copyright under either the 1909 or 1976 Acts, it is a prerequisite to suit. However, to initiate a suit, a plaintiff need not be the one who registered the copyright. *See Tang v. Hwang,* 799 F.Supp. 499, 503–04 (E.D.Pa.1992). *See also Vapac Music Publ'g Inc. v. Tuff 'N' Rumble Mgmt.,* 55 U.S.P.Q.2d 1763, 1764 (S.D.N.Y. July 19, 2000) ("By its terms, 17 U.S.C. § 411(a) requires only that a copyright be registered; it does not require that the plaintiff be the party who caused the registration to occur.").

■ LAMCO/ACEMLA has a non-exclusive license. As such, it does not have standing to bring a copyright infringement action. *See, e.g., R. Ready Prods., Inc. v. Cantrell,* 85 F.Supp.2d 672, 684 n. 11

(S.D.Tex.2000) ("Holders of a non-exclusive license lack standing to sue, because they have no ownership interest in the copyright."). Also, LAMCO/ACEMLA's recordation does not provide constructive notice because it fails to conform to the specificity requirements of 17 U.S.C. § 205(c). That section requires the recorded document to "specifically identif[y] the work to which it pertains so that, after the document is indexed by the Register of Copyrights, it would be revealed by a reasonable search under the title or registration number of the work." After reviewing the recorded documents, the Court finds that LAMCO/ACEMLA's recordation fails to conform to the specificity requirement of § 205(c). A careful review of the documents supports a finding that the title of the song at issue, "Ojos Chinos," is buried among 29 other songs in an attached sheet and the documents do not list or mention the previous registration number at all. LAMCO/ACEMLA's copyright infringement claim under "Ojos Chinos" shall be dismissed.

### 4. UNA TERCERA PERSONA

■ Luz Celenia Tirado wrote "Una Tercera Persona" in or around 1968. Tirado signed an agreement with Southern on November 20, 1968 in which she transferred to Southern "all rights, title and interest" in the song "Una Tercera Persona." Southern applied for and received a copyright registration certificate dated February 6, 1969. Pursuant to the agreement of November 20, 1968, Southern executed an assignment of the renewal rights, acting as attorney-in-fact for Tirado on June 6, 1996. Southern then obtained a copyright renewal registration certificate on June 11, 1996.

---

**13.** To allow LAMCO/ACEMLA to continue its copyright infringement case against ASCAP based upon Southern's (ASCAP's link to the song "Ojos Chinos") registration is somewhat perturbing. LAMCO/ACEMLA could have obtained a copyright renewal registration certificate but chose not to do so, for reasons that have not as of yet been explained.

Tirado apparently transferred the copyright ownership to 153 songs to LAMCO on December 2, 1980 and was recorded by LAMCO on February 8, 1985, although the copy of the certificate produced by LAMCO is virtually undecipherable. On September 25, 1986, Tirado and ACEMLA entered into a supplemental agreement whereby Tirado granted a non-exclusive license to the performing rights of all the music titles transferred to LAMCO by virtue of the previous agreement. LAMCO recorded the supplemental agreement on February 23, 1990. On December 26, 1984, LAMCO filed for the registration of the words and music to "Una Tercera Persona."

Southern's registration creates *prima facie* validity of its copyright. *See* 17 U.S.C. § 209 (1909 Act); *Saenger Org. v. Nationwide Ins. Lic. Assocs., Inc.*, 119 F.3d at 66 ("A copyright registration certificate issued by and filed with the Copyright Office serves to put the world on constructive notice as to the ownership of the copyright and the facts stated in the registration certificate."). Thus, LAMCO/ACEMLA is deemed to have constructive knowledge of Southern's ownership. LAMCO/ACEMLA do not challenge Tirado's assignment to Southern in 1968, nor do they challenge the registration by Southern of "Una Tercera Persona"in 1969. Southern (and ASCAP) failed to record the transfer. Since LAMCO/ACEMLA recorded first, LAMCO/ACEMLA would be the owner of the copyright to "Una Tercera Persona" if it took without notice and for valuable consideration. However, the registration certificate serves a dual purpose in this instance: (1) it forces the Court to find that LAMCO/ACEMLA had constructive

knowledge of Southern's ownership and (2) it shifts the burden to LAMCO/ACEMLA to demonstrate why the copyright is invalid. *See Saenger Org.*, 119 F.3d at 59. LAMCO/ACEMLA's claim of ownership must therefore fail. ASCAP, through Southern's ownership, has the right to license performances of "Una Tercera Persona."

### 5. "TE SIGO QUERIENDO"

Luz C. Tirado also wrote "Te Sigo Queriendo"sometime in 1968. On December 17, 1968, Tirado and Southern entered into an agreement whereby Tirado transferred all her rights in "Te Sigo Queriendo" to Southern. The agreement authorized Southern to apply for a copyright and to renew the copyright. Southern obtained a copyright registration certificate for the song on July 29, 1969. On June 13, 1997, Southern executed an assignment of the renewal rights in the copyright, acting as attorney-in-fact for Tirado, as permitted under the Copyright Act. On June 20, 1997, Southern renewed the copyright, obtaining a copyright renewal registration certificate.

On September 25, 1986, Tirado entered into an agreement with LAMCO transferring Tirado's rights to "Te Sigo Queriendo" to LAMCO. LAMCO obtained a copyright registration certificate for "Te Sigo Queriendo" on February 23, 1990.

ASCAP holds the right to license performances of "Te Sigo Queriendo" based upon its membership agreement with Southern.[14] Southern obtained a registration certificate for "Te Sigo Queriendo" in 1969 creating a presumption of ownership which LAMCO/ACEMLA must overcome. As LAMCO/ACEMLA has failed to overcome

---

14. LAMCO asserts that it should prevail because ASCAP did not record its agreement. However, under the 1909 Act, neither agreement (involving "Una Tercera Persona" or "Te Sigo Queriendo") needed to be recorded because they were transfers of common law copyright (since they preceded publication and registration).

this presumption, the Court holds for purposes of this summary judgment discussion only, that Southern owns "Te Sigo Queriendo." Southern's "chain of title from the author[, through Southern,] is presumed by reason of the registration certificate where [a party] obtained an assignment of rights prior to registration. 4[ ] NIMMER ON COPYRIGHT, § 13.01[A]. In the instant case, [Southern] obtained an assignment of rights from the authors prior to registration." *Marobie–Fl, Inc. v. National Ass'n of Fire Equip. Distrib.*, 983 F.Supp. at 1173.

### CONCLUSION

Wherefore, pursuant to the above stated reasoning, the Court finds that ASCAP, through it's representatives, is legally entitled to license performance of the songs "Caballo Viejo," "Patacón Pisa'o," "Una Tercera Persona," and "Te Sigo Queriendo." The Court thus **DISMISSES with prejudice** the claims involving these four songs. The Court further finds that LAMCO/ACEMLA has priority over the song "Ojos Chinos" based upon its non-exclusive licensing agreement with the author's heirs. The Court nevertheless **DISMISSES** LAMCO/ACEMLA's copyright infringement action based upon this song.

**IT IS SO ORDERED.**