**Rose ALEXANDER, Plaintiff,**

v.

**IRVING TRUST COMPANY, as Executor under the Last Will and Testament of Clarence P. Oberndorf, Deceased, and Columbia University Press, Defendants.**

United States District Court
S. D. New York.
June 28, 1955.

See also, 13 F.R.D. 137.

Richard J. Mackey, New York City, for plaintiff.

Abberley, Kooiman & Amon, New York City, for Irving Trust Co., as Executor, etc.

Satterlee, Warfield & Stephens, New York City, for Columbia University Press, David Asch, New York City, of counsel.

BICKS, District Judge.

This action for copyright infringement and unfair competition was instituted in 1952, against Clarence P. Oberndorf, as author, and Columbia University Press, as publisher of a book entitled "The Psychiatric Novels of Oliver Wendell Holmes", first published in 1943 and revised in 1946. The individual defendant died during the pendency of the

action and his executor, the Irving Trust Company, was substituted as a defendant.

■ The plaintiff claims that defendants' work infringes upon, and unfairly competes with her two-page article entitled "Oliver Wendell Holmes—Psychiatrist" published in a 1939 issue of a now-defunct medical journal. An injunction, damages and an accounting are sought. The owner of the copyright in plaintiff's work, the publisher of the journal in which it appeared, refused plaintiff's demand to execute an assignment of the copyright to her and is not a party to this action. Plaintiff urges that she is the equitable owner of the copyright and that the action was properly brought in her name alone. Jurisdiction of this court rests upon the Copyright Act, Title 17 U.S.C., and on diversity of citizenship.

In comparing plaintiff's and defendants' work to determine whether the later work plagiarized the earlier one, it is to be noted that both proceed from the same premise—the idea or theory that Holmes' novels showed an understanding of psychiatry that was a half century ahead of his time. In the compass of her two pages, plaintiff merely sets forth this theory and adds a few historical facts from both Holmes' life and the history of medicine. The references to the novels themselves are in general terms. The novels are neither summarized nor concretely analyzed to establish the basis for plaintiff's conclusions.

Oberndorf, on the other hand, made a painstaking analysis of all three of Holmes' novels showing their practical application in terms of present-day psychiatric knowledge. To the extent that his volume contained a certain amount of historical data, there was necessarily some similarity to plaintiff's article in the facts presented—the manner of expressing them, however, is different. Oberndorf's work was entirely original in its presentation of each of Holmes' three novels, abridged with a view to highlighting their significance as psychiatric and analytic studies of neuroses. Holmes' own language is used almost entirely, footnotes being added by the author based largely on his own clinical experience as well as outside sources—treatises and periodical literature on psychiatric and related subjects.

In a nineteen-page introduction to his 270 page volume, Oberndorf traces Holmes' background, attitudes and accomplishments as both author and doctor, then shows parallelisms between Holmes and Freud, whose doctrines Holmes anticipated in these novels. There are quotations from Holmes on such subjects as: the importance of the unconscious as a factor in negativing the concept of absolute freedom of the will; the mechanism of the free association of ideas—a postulate of psychoanalysis; dream life and psychic dualism. Under the heading, "Holmes as a Clinical Psychiatrist", which was Oberndorf's own field, the latter suggests that Holmes' views were so far in advance of the accepted medical theories of his day, that he chose to present his findings to the lay public in the form of these so-called "medicated novels," (a term used in Holmes' own day to describe his novels) the doctors in these works of fiction being a composite picture of Holmes himself. Observing the importance of the many ancestral influences on human behavior, he quotes Holmes' observation that the body "is not a private carriage, but an omnibus," a concept which became the "collective unconscious" of the famed Swiss psychiatrist, Carl Jung. Oberndorf tells the reader that Holmes' attitudes may have been a "compulsion to write off his father's Calvinism and predestination," but that the author prefers to avoid this subjective approach.

After this introduction each of the three stories is told in Holmes' words, with brief summaries where necessary to carry forward the thought. Each story is prefaced by an analysis from a purely psychiatric viewpoint, with footnotes relating the characters to Holmes' own life or to psychiatric observations. Comments at the end of each abridgement

again emphasize certain aspects of the novel in relation to present-day knowledge of the mainsprings of human behavior.

Plaintiff urges that her charge of plagiarism should be sustained because in a minutial dissection of the two works she finds the following similarities: the observation that Elsie Venner suffers from *dementia praecox,* the symptoms including among other things "negativism" and "isolation"; the reference to heredity as a factor responsible for abnormal conduct (in this both refer to Holmes' statement concerning the body as an "omnibus"); the assertion that Holmes anticipated Freud; mention of Holmes' Calvinist parents and his distinguished son, the Supreme Court Justice; comparison of Holmes' reference to the effect of shock as an antidote to mental illness with the use of metrazol in modern shock treatment; enumeration of Holmes' specific medical achievements; listing of certain of Holmes' contemporaries—the similarity being in some, and not all of the names mentioned in the two works; a reference to "merry widows", though in entirely different contexts.

Plaintiff urges that access should be inferred from these similarities. Some similarities in two works dealing with the same subject are inevitable. Those complained of here are unavoidable in any work treating with Holmes as a psychiatrist. They would not support a finding of infringement even if access had been established. Yankwich, Originality in the Law of Intellectual Property, 11 F.R.D. 457, 462. As indicated by Birrell, in Seven Lectures on the Law and History of Literary Property, 167: "The literary larcenist must do more than filch ideas * * * repeat information, borrow phrases, utilize quotations; you must be able to attribute to him the felonious intention of appropriating without independent labor a material part of a protected work." Here there is lacking both proof of access and of substantial similarity.

■■ Plaintiff seeks to attribute access to Oberndorf through a devious chain of acquaintances which Oberndorf and plaintiff had in common. This Court will not engage in speculation or conjecture to make a finding of access. Allen v. Walt Disney Productions, D.C.S.D.N.Y.1941, 41 F.Supp. 134, 136. The burden of proving access rests on plaintiff. Sarkadi v. Wiman, 2 Cir., 1943, 135 F.2d 1002; Jewel Music Pub. Co. v. Leo Feist, Inc., D.C.S.D.N.Y.1945, 62 F.Supp. 596. I find that no such access has been established.

■ A comparison of the two works demonstrates that defendant's work was created through independent labor and without appropriation of any of the literary matter protected by the copyright in plaintiff's work. Assuming that both works present the same idea, it is expressed in defendants' work in a manner totally different from that of plaintiff. A copyright does not pre-empt the field as against others who choose a different means of expressing the same idea. In this respect, it differs from a patent which protects the inventor against any unauthorized use of the discovery itself. As Judge Hough wrote in Dymow v. Bolton, 2 Cir., 1926, 11 F.2d 690, 691: "Just as a patent affords protection only to the means of reducing an inventive idea to practice, so the copyright law protects the means of expressing an idea; and it is as near the whole truth as generalization can usually reach that, if the same idea can be expressed in a plurality of totally different manners, a plurality of copyrights may result, and no infringement will exist." A century and a half earlier, Lord Mansfield put the same thought in these words: "we must take care to guard against two extremes equally prejudicial; the one that men of ability, who have employed their time for the service of the community, may not be deprived of their just merits, and the reward of their ingenuity and labour; the other, that the world may not be deprived of improvements, nor the progress of the arts be retarded. The act that

secures copyright to authors guards against piracy of the words and sentiments; but it does not prohibit writing on the same subject." Sayre v. Moore, East 360n, 102 Eng.Rep. 139n (1785).

The author of a scientific article published in a professional journal is certainly not entitled to a monopoly of the ideas presented therein. In the "Abie's Irish Rose" case—Nichols v. Universal Pictures Corporation, 2 Cir., 1930, 45 F. 2d 119, 121,—Judge Learned Hand observed: "If Twelfth Night were copyrighted, it is quite possible that a second comer might so closely imitate Sir Toby Belch or Malvolio as to infringe, but it would not be enough that for one of his characters he cast a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress. These would be no more than Shakespeare's 'ideas' in the play, as little capable of monopoly as Einstein's Doctrine of Relativity, or Darwin's theory of the Origin of Species."

■ Turning to the claim of unfair competition—inasmuch as there was no access and no appropriation of any substantial part of the material protected by the copyright in plaintiff's work, there can be no claim of unfair competition based on the content of defendants' work. Aside from the book itself, plaintiff urges unfair competition in the title and certain advertising matter. Titles of copyrighted works are not protected against their use by others unless they are distinctive and have acquired a secondary meaning. Manners v. Triangle Film Corp., 2 Cir., 1917, 247 F. 301, 303; Warner Bros. Pictures v. Majestic Pictures Corp., 2 Cir., 1934, 70 F.2d 310, 311. The title "Oliver Wendell Holmes—Psychiatrist" has not acquired a secondary meaning and is wholly descriptive. Kellogg Co. v. National Biscuit Co., 1938, 305 U.S. 111, 118, 59 S.Ct. 109, 83 L.Ed. 73. The title of defendants' book, "The Psychiatric Novels of Oliver Wendell Holmes" is also descriptive. It does not unfairly compete with that of plaintiff's article.

Plaintiff asserts that she has a right to the protection of her material independently of copyright on the theory of International News Service v. Associated Press, 1918, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211,—a decision involving a news gathering service where protection was given against the raiding of news services supplied by the plaintiff. This so-called "free ride" doctrine has been limited to cases where an attempt is made to secure an unfair advantage of the character proscribed in the Associated Press case. Cheney Bros. v. Doris Silk Corp., 2 Cir., 1929, 35 F.2d 279, 281, certiorari denied 281 U.S. 728, 50 S.Ct. 245, 74 L.Ed. 1145; Millinery Creators' Guild v. Federal Trade Commission, 2 Cir., 1940, 109 F.2d 175, 177; R. C. A. Mfg. Co. v. Whiteman, 2 Cir., 1940, 114 F.2d 86, 90; G. Ricordi & Co. v. Haendler, 2 Cir., 1952, 194 F.2d 914, 916.

■ Plaintiff's final claim is that certain quotations on the dust jacket of defendants' work invaded her legal rights because they assert that the Oberndorf book "Demonstrates Holmes' hitherto unsuspected knowledge of neuroses and the more clinical mental illnesses"; that he "has made a novel contribution to the literature of psychiatry. And for non-psychiatric readers he has opened a fascinating by-way in a familiar field"; that "in the light of Freudian psychiatry many of Holmes' aphorisms assume striking new meanings;" and that Oberndorf called attention "to the hitherto unnoticed psychological understanding of one of our famous doctors."

Plaintiff also objects to the following descriptions of the Oberndorf book by his publisher:

"In the abridged novels long descriptions and details of plot are omitted in order to emphasize the medical and psychiatric aspects. Thus Elsie Venner is shown to be a brilliant study of a schizophrenic girl; A Mortal Antipathy, a portrait of a severe phobia; and the Guardian Angel, a study of multiple personality. Holmes himself is re-

vealed as having a psychological originality and anticipated many of Freud's theories. * * *

"The book is a novel idea in psychiatric presentation and will appeal to everyone who is interested in the social aspect of mental disease."

These statements were a fair use of comments made by third parties concerning plaintiff's work; the comment by Columbia is an accurate description. Neither in any way reflect upon or injure plaintiff.

In the last analysis, plaintiff rests her claims of copyright infringement and unfair competition on the premise that she anticipated Oberndorf in presenting the idea or theory that Holmes' so-called "medicated novels" anticipated the psychiatrists, and particlarly the doctrine of dream states, submerged griefs and complexes developed by Freud. There is no property right in that idea and, in any event, plaintiff did not originate it. She ignores the fact that the subject was previously suggested by Van Wyck Brooks in his "Flowering of New England," a book which was on the best seller lists for 1936–1937. Oberndorf resorted to this work and actually quotes a statement from it concerning Holmes' "brilliant anticipation of Dr. Freud", and the observation that Holmes "had played into the hands of Dr. Freud."

While this decision rests upon the ground that there is no infringement of the copyright in plaintiff's work, and that the defendants did not indulge in unfair competition it should be noted that even if there had been any infringement, plaintiff would have no standing in this suit.

■ It is well settled that in an action for infringement of copyright, the copyright owner is an indispensable party. Buck v. Elm Lodge, Inc., 2 Cir., 1936, 83 F.2d 201; Goldwyn Pictures Corp. v. Howells Sales Co., 2 Cir., 1922, 282 F. 9; Kriger v. MacFadden Publications, Inc., D.C.S.D.N.Y.1941, 43 F.Supp. 170. Un-der certain circumstances the equitable owner of a copyright may be the proper party to bring a suit for infringement even though the legal title to the copyright is in the name of another. Hoffman v. Santly-Joy, Inc., D.C.S.D.N.Y. 1943, 51 F.Supp. 778, 779. Thus when the infringing party—the defendant—is the holder of the legal title to the copyright, the author of the work is entitled to maintain suit in his own name. Bisel v. Ladner, 3 Cir., 1924, 1 F.2d 436; Wooster v. Crane & Co., 8 Cir., 1906, 147 F. 515, 516. But plaintiff must do more than plead the legal conclusion asserting equitable ownership. Facts supporting the allegation that copyright was registered in the name of another for plaintiff's benefit must be established. Hoffman v. Santly-Joy, Inc., supra; Southern Music Pub. Co. v. Walt Disney Productions, D.C.S.D.N.Y.1947, 73 F.Supp. 580, 582.

Plaintiff has not offered any evidence to support her claim that she is the owner of the equitable title to the copyright. On the contrary, it appears that her article was accepted by the "Medical Journal" for "exclusive publication" in that magazine. Copyright was secured by the publisher in its name. There was no contract between the publisher and plaintiff, nor does plaintiff allude to any reservation of rights to her when she gave the publisher the authority to print her article in the "Medical Journal". In the absence of any proof to the contrary, it must be presumed that plaintiff transferred her work without any reservations whatever and that The Medical Journal & Record Publishing Company, Inc. became the absolute proprietor of the copyright. Dam v. Kirk La Shelle Co., 2 Cir., 1910, 175 F. 902, 41 L.R.A., N.S., 1002;[1] Kriger v. MacFadden Publications, Inc., supra. Plaintiff has, therefore, failed to establish her capacity to sue.

■ In a suit for copyright infringement, full costs are allowed to the pre-

---

**1.** Overruled on other grounds in Sheldon v. Metro-Goldwyn Pictures Corporation, 106 F.2d 45, 50 (2d Cir., 1939).

vailing party as a matter of right, and the court may award a reasonable attorney's fee to the prevailing party as part of the costs, 17 U.S.C. § 116. Marks v. Leo Feist, Inc., 2 Cir., 1925, 8 F.2d 460. In this case, I find that an award of attorney's fees in the amount of $500 is reasonable.

The complaint is dismissed with costs and disbursements plus a counsel fee of $500.