PEER INTERNATIONAL
CORP. et al.,

v.

LATIN AMERICAN MUSIC
CORP., et al.,

No. 97–2875 (PG).

United States District Court,
D. Puerto Rico.

Aug. 14, 2001.

Francisco A. Besosa, Axtmayer, Adsuar, Muniz& Goyco, San Juan, PA, for Plaintiff.

Eugenio C. Romero, Hato Rey, PR, Jorge A. Fernandez-Reboredo, for Defendants.

### OPINION & ORDER

PEREZ–GIMENEZ, District Judge.

Before the Court is Plaintiffs' Peer International Corporation ("Peer Int'l"), Peer International Corporation of Puerto Rico ("Peer PR"), Southern Music Publishing Company, Inc. ("Southern"), Peermusic Ltd. ("Peermusic"), Sonido, Inc. d/b/a FAF Publishing ("FAF"), EMI Catalogue Partnership ("EMI Catalog"), EMI April Music, Inc. ("EMI April"), and Broadcast Music, Inc. ("BMI") (collectively referred to as "Peer") Motion for Summary Judgment (Dkt.104), Defendants Latin American Music Company, Inc.'s ("LAMCO") and ACEMLA de P.R., Inc.'s ("ACEMLA") Opposition to Peer Plaintiffs' Motion for Summary Judgment and Motion for Partial Summary Judgment (Dkt.131), and Peer's Reply and Opposition to Defendants' Motion (Dkts.150). At issue in this copyright infringement case is ownership and copyright infringement of more than four-hundred (400) songs.[1]

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material, if under applicable substantive law, it may affect the result of the case and a dispute is genuine only if there is conflicting evidence that requires a trial to resolve the discrepancy. See Ortega–Rosario v. Alvarado–Ortiz, 917 F.2d 71, 73 (1st Cir.1990). Once the movant has presented probative evidence establishing its entitlement to judgment, the party opposing the motion must set forth specific facts demonstrating that there is a material and genuine issue for trial. See id.; Celotex Corp. v. Catrett, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether summary judgment is warranted, the court views the facts alleged in the light most favorable to the non-moving party and must indulge all inferences in favor of that party. See Rossy v. Roche Products, Inc., 880 F.2d 621, 624 (1st Cir. 1989).

"Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment per se. See Wiley v. American Greetings Corp., 762 F.2d 139, 141 (1st Cir.1985). Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. See id." Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir.1996).

Cross-motions for summary judgment are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist. If any such issue exists it must be disposed of by a plenary trial and not on summary judgment. See Rains v. Cascade Industries, Inc., 402 F.2d 241, 245 (3d Cir.1968). See also Redman v. Warrener, 516 F.2d 766, 768 & n. 2 (1st Cir.1975); 6 J. MOORE, MOORE'S FEDERAL PRACTICE ¶ 56.13 (2d ed.

---

1. In this Opinion & Order, the Court lays the groundwork for the soon-to-be appointed special master to recommend a position on ownership and copyright infringement for each song not specifically identified by the Court.

1981) ("The well-settled rule is that cross-motions for summary judgment do not warrant the court in granting summary judgment unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed.") (footnotes omitted). *Wiley v. American Greetings Corp.*, 762 F.2d at 140–41.

## FACTS

All told, Plaintiffs allege that they own and control the copyrights to 468 musical compositions at issue in this case.[2] Defendants dispute this, claiming that they hold a legal priority over 294 of the 468. Defendants admit they do not own or have a legal priority over 174 of the musical compositions.[3]

Plaintiffs allege to have acquired the copyrights to the songs in question through assignments with the composers or their heirs. Plaintiffs have granted to BMI and ASCAP non-exclusive licenses to in turn issue and administer public performance licenses to broadcasters. The assignments granted by the composers to the plaintiffs are made in standard forms redacted by the plaintiffs.

More specifically, Peermusic contends that they own and control the copyrights in musical compositions Nos. 1 to 407.[4]

Sondio, Inc., d/b/a FAF Publishing ("FAF") is allegedly the exclusive licensee of the copyrights in the musical compositions Nos. 408 to 451 ("FAF Compositions"). The FAF Compositions were originally owned by Fania Publishing Co. ("Fania") by virtue of songwriter agreements made directly with the author of the FAF Compositions. At all times relevant hereto, Fania Publishing was a wholly-owned subsidiary of Fania Records, Inc. ("Fania Records"). By agreement dated October 23, 1979, Fania Records assigned all of the copyrights and Composer Agreements owned by Fania Records and its wholly-owned subsidiaries to Valsyn, S.A. ("Valsyn").

By agreement dated October 1, 1986, as amended by letter agreement on September 24, 1997, Valsyn granted plaintiff FAF the exclusive right and license to exploit and administer Valsyn's publishing rights in the FAF Compositions and to defend, prosecute, and settle, in FAF's own name, all claims for copyright infringement arising in the United States or Puerto Rico during the period from October 1, 1986 through December 31, 1999.

EMI Catalogue acquired the rights to the EMI Catalogue Compositions (except for "EI Africano") from Morro Music Corp. ("Morro") in a series of transactions in 1982 and 1983. On June 16, 1982, Morro (together with Big Town Music, Inc., Cuban Music Corp. and Ariston Music, Inc.) merged into Unart Music Corporation. The Certificate of Merger and Own-

---

**2.** In support, Plaintiffs introduced documents through the declarations of Jaegerman, Gallo and Insogna. Plaintiffs have alleged that within the three years prior to the filing of the complaint in this action, Defendants have issued blanket public performance licenses to broadcasters for the compositions included in the ACEMLA "partial catalogs", which include each of the Publishers' Compositions to broadcasters in the United States. Plaintiffs also have alleged that within the three years prior to the filing of the complaint in this action, Defendants have licensed the public performance of each of the Publishers' Compositions to broadcasters in the United States.

**3.** The Court need go no further on ownership of these musical compilations, hereafter referred to as the SPACEM compilations.

**4.** The Peermusic Plaintiffs specifically refer to the declaration of Peterson Jaegerman, which supposedly identifies the copyright chains of title for the Peermusic Compositions (Nos. 1 to 407).

ership dated June 16, 1982, was recorded in the U.S. Copyright Office on January 24, 1983, in volume 1962, pages 368–73.

On June 17, 1982, Unart Music Corporation, among others, merged into United Artists Corporation. The Certificate of Ownership and Merger merging U.A. Music International, Inc., Unart Music Corporation, U.A. Cinemusic, Inc., United Artists Music Co., Inc., and United Artists Television, Inc. into United Artists Corporation, dated June 17, 1982, was recorded in the U.S. Copyright Office on January 24, 1983, vol.1962, pages 374–80, 407–14.

By an agreement dated December 15, 1982, United Artists Corporation assigned all of the copyrights in its musical works, including the EMI Catalogue Compositions, to CBS, Inc. By an agreement dated September 23, 1983, CBS, Inc. assigned to CBS Catalogue Partnership, its successors, and assigns, all of the rights to the copyrights it acquired from United Artists pursuant to the December 15, 1982 Main Agreement. In August 1989, CBS Catalogue Partnership changed its name to SBK Catalogue Partnership, and thereafter SBK Catalogue Partnership changed its name to EMI Catalogue Partnership. A true and correct copy of the Confirmation of Name Change and Continuance of Ownership of Copyright Interests was recorded in the U.S. Copyright Office on August 7, 1989, in volume 2487, pages 286–88. Thus, Plaintiffs allege, EMI Catalogue, through its predecessor-in-interest Morro, acquired ownership of the copyrights in musical compositions Nos. 452 to 468 (the "EMI Compositions").[5]

In early 1980, L. Raul Bernard founded LAMCO and ACEMLA to represent Latin American authors and composers for the protection of their copyrights. LAMCO is a music publishing company that obtains exclusive copyrights from music composers or their legal representatives. ACEMLA calls itself a performing rights society that represents authors and composers in the monitoring of their work and in the collection and administration of their royalties. The Court in *ACEMLA v. Copyright Tribunal*, 763 F.2d 101, 107–08 (2d Cir.1985), determined that ACEMLA is a performing rights society with broadcasters through non-exclusive performing rights licenses.[6] On November 3, 1986 Sociedad Puertorriquena De Autores, Compositores y Editores De Musica ("SPACEM"), which had been affiliated to ASCAP for several years, licensed ACEMLA to manage its catalog and collect its royalties for a term of five (5) years. The assignment added 247 composers and about 581 titles to ACEMLA's catalog. During 1992–93, SPACEM was dissolved and many of its members became affiliated with ACEMLA. As a result of this, about 174 songs of 13 authors of the SPACEM catalog that did not sign with ACEMLA and that are claimed by the plaintiffs remained in ACEMLA's catalog undetected for a while. ACEMLA has since revised its catalog. Defendants also allege as a defense that Plaintiffs have not complied with the payment of royalties to the composers, nor with the submission of periodic reports of performance or payment liquidation.

For their part, Plaintiffs contend that Defendants LAMCO and ACEMLA hold themselves out as the owners and/or controllers of the copyrights, including public performance rights, in the Publishers'

---

5. The EMI Plaintiffs copyright chains of title for the EMI Compositions were included as attachments to the Insogna Declaration.

6. Of course, that case, along with the line that followed, specifically constricted that decision to that particular case. Nevertheless, that determination is moot for purposes of this case.

Compositions and have issued licenses to third parties to exploit the copyrights in the Publishers' Compositions. Defendants' ACEMLA website, located at www.acemla.com, contains substantial portions of recordings of the following musical compositions claimed by plaintiffs: *El Africano* (Wilfredo Martinez and Calixto Ochoa), *Rebeldia* (Pepito Lacomba), *Anacaona* (Tite Curet Alonso), *Periodico de Ayer* (Tite Curet Alonso), *Una Tercera Persona* (by Luz Celenia Tirado), *Nuestra Sangre* (by Flor Morales Ramos, a/k/a Ramito), *Genesis* (by Guillermo Venegas), and *Sombras* (by Carlos Brito and R. Sansores). Any person visiting ACEMLA's website with a properly configured computer can play and listen to each of these recordings at will.[7]

Plaintiffs furthermore allege that within three years prior to commencement of this action, Defendants LAMCO and ACEMLA PR created and distributed a CD–ROM containing recordings of, among others, the following compositions: *Sombras* (by Carlos Brito and R. Sansores), *Rebeldia* (by Pepito Lacomba), and *Genesis* (by Guillermo Venegas). The creation and distribution of the CD–ROM was seemingly without the consent or authority of any of the Publisher Plaintiffs.

Plaintiffs also allege that within the past three years, Defendants LAMCO and ACEMLA PR distributed a compact disc containing a recording of *Mesie Bombe* (Tite Curet Alonso), without any of the consent or authority of the EMI Plaintiffs and that none of the Publisher Plaintiffs ever authorized Defendants to license, use or exploit any of their rights in the respective Publishers' Compositions.

Bernard is the chief executive officer, director and majority shareholder of de-fendants LAMCO and ACEMLA PR. At all times pertinent to this action, Bernard had the right and ability to supervise and control LAMCO's and ACEMLA PR's music licensing activities. At all times pertinent to this action, Bernard had the right and ability to supervise and control LAMCO's and ACEMLA PR's activities regarding the creation, maintenance and distribution of the ACEMLA CD–ROM and the ACEMLA website. By virtue of Bernard's role as majority shareholder of LAMCO and ACEMLA PR, Bernard had a financial stake in the music licensing activities of the LAMCO Defendants.

## APPLICABLE COPYRIGHT LAW & DISCUSSION

Copyright is a form of protection provided by the United States Constitution to the authors of "original works of authorship," including literary, dramatic, musical, artistic, and certain other intellectual works. This protection is available to both published and unpublished works. Section 106 of the 1976 Copyright Act generally gives the owner of copyright the exclusive right to do and to authorize others to do the following: (1) to reproduce the work in copies or phonorecords; (2) to prepare derivative works based upon the work; (3) to distribute copies or phonorecords of the work to the public by sale or other transfer of ownership, or by rental, lease, or lending; (4) to perform the work publicly, in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works; (5) to display the copyrighted work publicly, in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural

---

**7.** Indeed, the Court did visit ACEMLA's site and listened to several of the works at issue here.

works, including the individual images of a motion picture or other audiovisual work; and (6) in the case of sound recordings, to perform the work publicly by means of a digital audio transmission. *See* 17 U.S.C. § 106 (Supp.2000). It is illegal for anyone to violate any of the rights provided by the copyright law to the owner of copyright.[8]

■ In order to prevail in a copyright infringement action, LAMCO must establish (1) authorship of the songs in question; (2) ownership of copyrights; (3) compliance with the statutory requirements to obtain copyrights; and (4) unauthorized (5) public performance. *See Pedrosillo Music, Inc. v. Radio Musical, Inc.*, 815 F.Supp. 511, 514 (D.P.R.1993). "A determination of ownership is a conclusion of law based on underlying facts. 3 NIMMER [ON COPYRIGHT] § 13.01[A]." *Motta v. Samuel Weiser, Inc.*, 768 F.2d 481, 484 (1st Cir.), *cert. denied*, 474 U.S. 1033, 106 S.Ct. 596, 88 L.Ed.2d 575 (1985).

## REGISTRATION

■ Copyright protection begins when an author creates a work by fixing it in a tangible medium of expression. The registration of the copyright is a legal formality. Only in certain circumstances is registration a requirement to obtain copyright protection. When works were copyrighted is of importance in this case. For works published between January 1, 1964 and January 1, 1993, renewal of the copyright is automatic and copyright cannot be lost for failure to register and renew. *See* 17 U.S.C. § 304(a) (Supp.2000).

■ Though generally permissive, registration confers important advantages on the registrant. Included in these advantages are that (1) registration establishes a public record of the claim of copyright; (2) it secures the right to file an infringement suit; (3) it establishes *prima facie* validity of the copyright; (4) it makes available a broader range of remedies for an infringement suit, allowing recovery of statutory damages and attorney's fees; and (5) only if registration is made will recordation of a document in the Copyright Office give constructive notice of the facts stated in the recorded document.[9]

■ A plaintiff bears the burden of proving that they own the copyrights in an infringement action. The registration certificate gives the presumption of the satisfaction of the statutory formalities. Likewise, the chain of title from the author to the person that obtained an assignment of rights prior to registration may also be presumed from the registration certificate. The person thus needs only to show the registration and evidence of his or her chain of title from the original copyright registrant to establish *prima facie* ownership. *See* 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 13.01[A]. When an assignee of the copyright (either common law or statutory) first registers a claim of statutory copyright in his name and obtains a certificate of registration in his name that constitutes *prima facie* evidence of the validity of his copyright and of the facts stated therein, the opposing party, in this case

---

**8.** These rights, however, are not unlimited in scope. Sections 107 through 121 of the 1976 Copyright Act establish limitations on these rights.

**9.** To register the claimant must send three elements in the same envelope to the Register of Copyrights: (1) a properly completed application form; (2) a non-refundable fee for each application; and (3) a deposit copy of the work to be registered. Copyright registration is effective on the date of receipt in the Copyright Office of all the required elements in acceptable form.

LAMCO/ACEMLA, has the burden of controverting the chain of title.

At oral argument on the motions for summary judgment, Defendants acceded to Plaintiff's registration, instead attacking from another angle. Defendants argue that Plaintiffs' ownership should be rescinded, a point that the court reserves discussion on until later. For now, it is enough to say that Plaintiffs seem to have proven both registration and chain of title. They have certainly made of a *prima facie* case. The court rules, therefore, that Plaintiffs are *prima facie* "owners" of the copyrights at issue.[10]

Some of the songs before the Court implicate both the 1909 Act and the 1976 Act. Prior to the 1976 Act taking effect on January 1, 1978, the 1909 Act controlled federal copyright law in the United States. The 1976 Copyright Act overhauled the copyright system by introducing many changes. Some of the more important aspects of the 1976 Act include the preemption of common law copyright, extending the term of copyright, a change in the requirement of formalities (which was further altered by the Berne Convention Implementation Act of 1988 ("BCIA")), and ownership.

Both the 1909 Act and the provisions of the 1976 Act as originally enacted remain relevant for several reasons. The 1976 Act specifically incorporates provisions of the 1909 Act and also retains standards developed through case law decided under the 1909 Act, such as the standards for originality and copyright infringement.[11]

In its discussion, the Court fuses the 1976 Act and its predecessor, the 1909 Act, along with several of the more recent alterations, into its discussion.

Section 209 of the 1909 Act stated that the copyright certificate of registration "shall be admitted in any court as *prima facie* evidence of the facts stated therein." 3 NIMMER ON COPYRIGHT § 9.06[D][2]. Section 410(c) of the 1976 Copyright Act provides: "In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court." The significant difference between these two provisions is that the *prima facie* effect of registration was achieved under the 1909 Act whenever registration occurred, whereas under the current Act, it is limited to those registrations that occur before, or within five years after, first publication of the work. *See* 3 NIMMER ON COPYRIGHT § 12.11[A].

Both § 411(a) of the current Act and § 13 of the 1909 Act require registration before "an action or proceeding ... for infringement of copyright" can be pursued. By reason of § 412, in order for a copyright owner to be entitled to recover statutory damages and attorney's fees, the work must have been registered prior to commencement of the infringement for which such remedies are sought. "Com-

---

10. Of course, the special master shall go through each musical composition at issue document by document to ensure that all is "kosher."

11. It is partly because of this overlapping and interweaving that copyright law can be a maze to both practitioners and courts. "A copyright scholar has a complicated task-to

be conversant with the provisions of the 1909 Act, the 1976 Act as originally enacted, and subsequent amendments to the 1976 Act, and also to be able to determine which piece of legislation is applicable in a particular situation." MARSHALL LEAFFER, UNDERSTANDING COPYRIGHT LAW § 1.5[D] (2d ed.1995).

mencement" of the infringement means "the time when the first act of infringement in a series of ongoing discrete infringements occur." The benefits of avoiding United States Registration are slight compared to the costs associated with not registering, notably giving up attorney's fees, statutory damages and the *prima facie* presumption of copyright validity. *See id.* § 7.16[b][1][b].

█ Works could obtain statutory copyright protection under the 1909 Act without the necessity of registration by publishing copies of the work bearing a proper copyright notice. In this way, registration did not create the copyright, but merely recorded it. *See id.* § 7.16[A][2][a]. Section 109 of the Transitional and Supplementary Provisions of the current Act, as construed in the House Report states: "Several provisions of the bill, including sections 205(c)(2), 205(d), 152 405(a)(2), 406(a)(1), 406(a)(2), 411, and 412, prescribe registration or recordation as a prerequisite for certain purposes. Where the work involved is covered by a subsisting copyright when the new law becomes effective, it is intended that any registration or recordation made under the present [1909] law would satisfy these provisions." *Id.* at § 7.16[D]. The 1909 Act therefore remains relevant when discussing ownership for works created prior to 1978. Under the 1976 Act, copyright registration is not necessary for the copyright to be protected. *See Everts v. Arkham House Publs., Inc.,* 579 F.Supp. 145 (D.Wis.1984) (registration is irrelevant to the existence of copyright protection under either the 1909 or 1976 Acts). However, registration is a prerequisite to an infringement action, although it may be ob-

tained at any time during the copyright term.

## TRANSFER AND/OR ASSIGNMENT OF OWNERSHIP

█ The general rule is that a prior transferee takes priority over a subsequent transferee if the prior transferee properly recorded in the Copyright Office prior to the subsequent transferee recording in the Copyright Office. *See* NIMMER ON COPYRIGHT § 10.07[A][1][a]. However, a search of Copyright Office records is just the starting point for an investigation into who owns which rights in a given work. *See Jim Henson Productions, Inc. v. John T. Brady & Associates, Inc.,* 16 F.Supp.2d 259 (S.D.N.Y.1997). Although transfers of copyright are normally made by contract, the Copyright Office does not have any forms for such transfers and although recordation is not required to make a valid transfer between the parties, it does provide certain legal advantages and may be required to validate the transfer as against third parties. *U.S. Copyright Office's Transfer of Copyright Section of Circular 1–Copyright Basics, http://loc.gov/copyright/ circs/circl.html* (U.S. Copyright Office, as of July 20, 2000).

█ Stated more precisely, under the 1976 Act a prior transferee always prevails over a subsequent transferee if the prior transferee properly recorded in the Copyright Office prior to the subsequent transferee's recordation, and the work in question has been registered. *See* NIMMER ON COPYRIGHT § 10.07[A][1][a]. However, the prior transferee does not automatically forfeit the copyright simply because the subsequent transferee recorded first in time.[12] *See id.* If the prior trans-

---

12. It is here where the statutory grace periods come into play-three months under the 1909 Act and either one (within the United States)

or two (outside the United States) months under the 1976 Act. The grace period allows a

feree fails to register and record before the subsequent transferee (and within the statutory grace period), then the subsequent transferee *may* prevail. *See id.* The subsequent transferee must clear several hurdles to prevail: the subsequent transferee (1) must be without notice; (2) must have paid valuable consideration; and (3) must have duly recorded his or her transfer before recordation of the prior transfer. *See id.*

Under the 1909 Act, if the prior transferee did not record within the three (3) month grace period, he or she would not prevail against a subsequent transferee who did record within the applicable grace period (assuming the subsequent transferee had no notice of the prior transfer and paid a valuable consideration). *See* 3 NIMMER ON COPYRIGHT § 10.07[A][1][b].

Under the 1976 Act, even if a prior transferee fails to record, and indeed even if the prior transferee never records his transfer, he will still prevail as against a subsequent transferee who takes with notice of the prior transfer.[13] *See Rytvoc, Inc. v. Robbins Music, Corp.,* 289 F.Supp. 136 (S.D.N.Y.1967). Section 30 of the 1909 Act also required that the subsequent transferee be "without notice." Section 205(d) of the 1976 Act added that the transfer be "taken in good faith" as well as "without notice." 3 NIMMER ON COPYRIGHT § 10.07[A][2]. The term "notice" in the 1976 Act's § 205(d) and 1909 Act's § 30 includes actual notice, inquiry notice,

and constructive notice. *See id.* "[C]onstructive and presumed[, also known as inquiry,] notice or knowledge are equivalent to knowledge. So, when [a party] has notice or information to put a reasonable person on inquiry, or has the opportunity to obtain knowledge from sources open to his investigation (such as public records or corporation books)," he or she is held to have notice. *General Bedding Corp. v. Echevarria,* 947 F.2d 1395, 1397 (9th Cir. 1991). Actual notice is a legal question which may pose difficult questions of proof as to whether a subsequent transferee possessed actual knowledge of a prior transfer. Inquiry or presumed notice is generally a question for a jury that hinges on all the attendant facts. *See id.*

The presence or absence of good faith is also a question for the jury. Good faith entails "not only honesty in fact, but reasonableness as well." *Quinto v. Legal Times of Washington, Inc. .,* 506 F.Supp. 554, 562 (D.D.C.1981). *See also In re AEG Acquisition Corp.,* 127 B.R. 34, 43–44 (C.D.Cal.1991), *aff'd,* 161 B.R. 50 (1993) ("a later transfer of an interest in a copyright qualifies for priority only if the transferee has been honest in fact[, i.e., acted in "good faith",] in the transaction at issue, and has also met each of the other qualifications"). A defendant must make a "good faith" effort to avoid copyright infringement. *See Olan Mills, Inc. v. Linn Photo Co.,* 23 F.3d 1345, 1348 (8th Cir.1994). " 'Good faith' is an ancient concept in the law, normally equated with 'honesty of intention', *In Re Johnson,* 708 F.2d 865, 868

---

short window for the prior transferee to record and still maintain priority.

13. Plaintiffs argue, and the Court agrees, that Defendants had notice of, either actual or constructive, that Plaintiffs are the copyright owners of musical compositions Nos. 1 to 468. At oral argument, Defendants stated that they were aware of Plaintiffs registrations. The registrations themselves should

put a party on notice that the party listed therein may be the owner or licensee. Finally, Defendants could have (and should have) asked the author, who clearly must know about the agreements they entered into, signed, and apparently received at least some money from. These factors together lead to the conclusion that Defendants had either actual or constructive notice.

(2d Cir.1983), and acting 'equitably', *In Re Goeb*, 675 F.2d 1386, 1390 (9th Cir.1982)." *American Home Assur. Co. v. Baltimore Gas & Elec. Co.*, 1987 WL 4928, at *5 n. 3 (S.D.N.Y.1987), *aff'd*, 845 F.2d 48 (2d Cir. 1988). Even where the defendant believes in good faith that he is not infringing a copyright, he may be found liable. *See County of Ventura v. Blackburn*, 362 F.2d 515 (9th Cir.1966). More than simple "innocence" is required.

To summarize, under the 1909 Act, a failure to record an assignment rendered it void only as against "any subsequent purchaser or mortgagee for a valuable consideration without notice, whose assignment has been duly recorded." 17 U.S.C. § 30 (1909 Act). Under the Copyright Act of 1976 as initially enacted, the obligation to record a transfer applied to any case in which the plaintiff was someone other than the author. In such circumstances, the plaintiff must first record in the Copyright Office "the instrument of transfer" under which the plaintiff asserts ownership of the rights allegedly infringed. Having thus recorded, suit may thereafter be brought for causes of action that arose prior to, as well as after, such recordation.[14] The foregoing rule continues to apply to all decennial infringement actions, i.e., all actions alleging infringement from the effective date of the current Act, January 1, 1978, until its amendment by the BCIA, March 1, 1989. As to infringements occurring after March 1, 1989, however, the BCIA eliminates this prerequisite, with respect to both American and foreign claimants. The 1909 Act *did not require* recordation of transfers. *See* 3 NIMMER ON COPYRIGHT § 12.08.

Current law does not differentiate between an assignment and a license as prior law had. Under the 1909 Act, this distinction was an important one. An assignment carried the entire copyright to a person (a "proprietor"). A license carried less than the entire copyright (e.g., only the right to publicly perform a musical composition). Only the name of the proprietor could be placed in the copyright notice and only a proprietor could bring an action for copyright infringement. The 1976 Act reformed this concept by considering a person who holds an exclusive license to publicly perform the work of the "owner." Thus, what is now important is whether the license is exclusive or nonexclusive.

Transfers of copyright that are executed outside the United States require no special rules. However, under § 204(b), foreign transfers that are accompanied by a certificate of acknowledgment issued by a diplomatic or consular officer of the United States or a person authorized to administer oaths are considered *prima facie* evidence of the execution of transfer.[15]

## RENEWAL

Under the 1909 Act, works copyrighted in the United States prior to January 1, 1978, were subject to a renewal system in which the term of copyright was divided into two consecutive terms. Renewal registration, within strict time limits, was required as a condition of securing the second term and extending the copyright to its maximum length.[16] On January 1, 1978, the current copyright law came into effect in the United States. This law re-

---

14. This, of course, does not determine ownership.

15. This is not to say that an assignment or transfer unaccompanied by a certificate of acknowledgment is not entitled to *prima facie*

weight. *See In Design v. Lauren Knitwear Corp.*, 782 F.Supp. 824, 829 (S.D.N.Y.1991).

16. Copyright can be transferred inter vivos or upon death from the author or initial copyright owner, and transferred again.

tained the renewal system for works that were copyrighted before 1978 and were still in their first terms on January 1, 1978. For these works the statute provided for a first term of copyright protection lasting for 28 years, with the possibility for a second term of 47 years. The 1992 amending legislation automatically secures this second term for works copyrighted between January 1, 1964, and December 31, 1977. *See U.S. Copyright Office's Renewal of Copyright of Circular 15, http://loc.gov/copyright/circs/circ 15.html* (U.S. Copyright Office, as of July 20, 2000). The term of copyright in works copyrighted between January 1, 1964, and December 31, 1977, is now 95 years. There is no requirement to register a renewal in order to extend the original 28–year copyright term to the full term of 95 years. Although the renewal term is secured automatically, the Copyright Office does not issue a renewal certificate for these works unless a renewal application and fee are received and registered in the Copyright Office.

When the copyright owner transfers rights in the renewal term and survives until renewal vesting, then rights in the renewal term belong to the assignee. *See* 3 NIMMER ON COPYRIGHT § 9.06[B]. An assignment of the right to renewal copyright executed by an author prior to the vesting of such renewal right will upon such vesting be binding upon the author, so that thereafter the assignee and not the author will be entitled to such renewal. Several courts have held that as long as the renewal application is filed in the name of a person entitled to such renewal, the application may actually be filed by any person authorized by the proper claimant to do so. *See Rose v. Bourne, Inc.,* 279 F.2d 79 (2d Cir.), *cert. denied,* 364 U.S. 880, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960); *Rossiter v. Vogel,* 134 F.2d 908 (2d Cir.1943); *Goodman v. Lee,* 815 F.2d 1030, 1031 n. 2 (5th Cir.1987).

However, if the author (or transferor of the renewal expectancy) passes away before the renewal rights vest, then those persons who by statute succeed to the renewal rights are not bound by any assignment (or transfer) executed by the deceased. *See* 3 NIMMER ON COPYRIGHT § 9.06[C]. In other words, death extinguishes the renewal rights of the assignee.

Under the 1976 Act

"[a]n assignment by an author of his renewal rights made before the original copyright expires is valid against the world, if the author is alive at the commencement of the renewal period. *[Fred] Fisher Co. v.[M.] Witmark & Sons,* 318 U.S. 643[, 63 S.Ct. 773], so holds." *Id.,* 362 U.S., at 375, [80 S.Ct. 792]. If the author dies before that time, the "next of kin obtain the renewal copyright free of any claim founded upon an assignment made by the author in his lifetime. These results follow not because the author's assignment is invalid but because he had only an expectancy to assign; and his death, prior to the renewal period, terminates his interest in the renewal which by § 24 vests in the named classes."

*Stewart v. Abend,* 495 U.S. 207, 219, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990). In relation to the 1909 Act, the Supreme Court held that

"[t]he right of renewal is [likewise] contingent. It does not vest until the end [of the original term]. If [the author] is alive at the time of renewal, then the original contract may pass it, but his widow or children or other persons entitled would not be bound by that contract." 5 Legislative History of the 1909 Copyright Act, Part K, p. 77 (E. Brylawski & A. Goldman eds.1976) (statement

of Mr. Hale). Thus, the renewal provisions were intended to give the author a second chance to obtain fair remuneration for his creative efforts and to provide the author's family a "new estate" if the author died before the renewal period arrived.

*Id.* at 219–20.

Both certificates were required as a condition of renewal. But by virtue of the Copyright Renewal Act of 1992, different considerations govern works from 1964 through 1977. Now, the renewal term subsists automatically, even if neither an original nor a renewal application has ever been filed with the Copyright Office.

## RESCISSION & ITS DERIVATIONS

■ Defendant has alleged that the publishers failed to pay royalties to some authors. A failure to pay royalties may give rise to a breach of contract or rescission action, as well as an action for copyright infringement.

■ "Rescission has the effect of voiding a contract from its inception, i.e., as if it never existed. *See* 17B C.J.S. Contracts § 456 (1999). It is an equitable doctrine which is grounded on mutual mistake, fraud, or illegality in the formation of a contract.[17] *See Roseburg Lumber Co. v. Madigan,* 978 F.2d 660, 665 (Fed.Cir. 1992); *American Science and Engineering, Inc. v. United States,* 229 Ct.Cl. 47, 663 F.2d 82, 87 (1981); *Pacific Architects and Engineers, Inc. v. United States,* 203 Ct.Cl. 499, 491 F.2d 734, 742 (1974)." *Dow*

*Chemical Co. v. United States,* 226 F.3d 1334, 1345 (Fed.Cir.2000).

Generally, "[i]f the [licensee's] improper conduct constitutes a breach of a covenant undertaken by the [licensee] . . . and if such covenant constitutes an enforcible contractual obligation, then the [licensor] will have a cause of action for breach of contract," not copyright infringement. 3 NIMMER ON COPYRIGHT, *supra,* § 10.15[A], at 10–120. However, "[i]f the nature of a licensee's violation consists of a failure to satisfy a condition to the license . . ., it follows that the rights dependant upon satisfaction of such condition have not been effectively licensed, and therefore, any use by the licensee is without authority from the licensor and may therefore, constitute an infringement of copyright." *Id.* at 10–121 (citations omitted); *see also Fantastic Fakes, Inc. v. Pickwick Int'l, Inc.,* 661 F.2d 479, 483–84 (5th Cir.1981). A condition has been defined as "any fact or event which qualifies a duty to perform." *Costello Publ'g Co. v. Rotelle,* 670 F.2d 1035, 1045 n. 15 (D.C.Cir.1981) (citing CORBIN, CONDITIONS IN THE LAW OF CONTRACT, 28 YALE L.J. 739 (1919)). A material breach of a covenant will allow the licensor to rescind the license and hold the licensee liable for infringement for uses of the work thereafter. *See Rano v. Sipa Press, Inc.,* 987 F.2d 580, 586 (9th Cir.1993) ("[A] material breach of a licensing agreement gives rise to a right of rescission which allows

---

**17.** Rescission is appropriate when one or more of several circumstances is present. *See Id. See also Roseburg,* 978 F.2d at 665 (stating that rescission applies when "there has been a mutual mistake of material fact, resulting in a contract which does not faithfully embody the parties actual intent."); *American Science,* 663 F.2d at 87 ("This court will not declare a contract between the government and a private party void ab initio unless there was

'plain illegality' in the contract."); *Pacific Architects,* 491 F.2d at 742 (stating that rescission applies when a party has been induced to enter a contract by material misrepresentation.). Because rescission is essentially an equitable remedy, it will not ordinarily be invoked where money . . . will adequately compensate a party to the contract. *See* 17B C.J.S. Contracts §§ 467, 476 (1999). *Id.* at 1345–46.

the nonbreaching party to terminate the agreement."); *Costello Publ'g Co.,* 670 F.2d at 1045 ("[E]ven if the counterclaims asserted merely constitute a breach of contract, an action for copyright infringement would lie if the breach is so material that it allows the grantor power to recapture the rights granted so that any further use of the work was without authority."); 3 NIMMER ON COPYRIGHT, *supra,* § 10.15[A], at 10–123–10–125; *see also Lulirama Ltd. v. Axcess Broad. Servs., Inc.,* 128 F.3d 872, 882–83 (5th Cir.1997) (holding that non-exclusive license is not revocable at will of licensor). Under New York law, rescission is permitted if the breach is "material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Septembertide Publ'g, B.V. v. Stein and Day, Inc.,* 884 F.2d 675, 678 (2d Cir.1989) (internal quotation marks and citation omitted).

*Graham v. James,* 144 F.3d 229, 236–37 (2d Cir.1998).

 A failure to pay royalties does not automatically cause a rescission of the agreement. As stated above, the breach must be material. The Eleventh Circuit in *Jacob Maxwell, Inc. v. Veeck,* 110 F.3d 749, 753 (11th Cir.1997), held that a material breach

would do no more than entitle JMI to rescind the agreement and revoke its permission to play the song in the future, actions it did not take during the relevant period. One party's breach does not automatically cause recision of a bilateral contract. *See Fosson v. Palace (Waterland), Ltd.,* 78 F.3d 1448, 1455 (9th Cir.1996) (recognizing "the rule applied in other circuits that once a non-breaching party to an express copyright license obtains and exercises a

right of rescission by virtue of a material breach of the agreement, any further distribution of the copyrighted material would constitute infringement") (emphasis added); *Hyman v. Cohen,* 73 So.2d 393, 397 (Fla.1954) ("'A material breach, as where the breach goes to the whole consideration of the contract, gives to the injured party the right to rescind the contract or to treat it as a breach of the entire contract ....'") (quoting 12 Am.Jur. Contracts § 389) (emphasis added); 3 M. Nimmer & D. Nimmer, NIMMER ON COPYRIGHT § 10.15[A], at 10–125–126 (1996) ("Upon such rescission, the assignment or license is terminated and the copyright proprietor may hold his former grantee liable as an infringer for subsequent use of the work.").

"[I]t is [also] well established that conduct indicating a willingness to continue to honor a contract, despite knowledge that the other party has failed to perform, 'operates as a promise to perform in spite of that non-occurrence.' Restatement (Second) of Contracts, § 246; *see also Flanders,* 165 F. at 321 (1st Cir.1908) (holding that a breach by one party gives the other the right of election to continue under the contract or to sue for rescission); *accord Apex Pool Equip. Corp. v. Lee,* 419 F.2d 556, 561 (2d Cir.1969) ( '[T]he power to terminate a continuing contract because of a particular breach of that contract is a power of election.')." *AccuSoft Corp. v. Palo,* 237 F.3d 31, 55 (1st Cir.2001).

 The failure to pay royalties under 17 U.S.C. § 115 of the 1976 Act explicitly gives rise to an action for copyright infringement. Also, § 1(e) of the 1909 Act allows for federal jurisdiction in an action for failure to pay royalties. *See T.B. Harms Co. v. Eliscu,* 339 F.2d 823 (2d Cir.1964), *cert. denied,* 381 U.S. 915, 85 S.Ct. 1534, 14 L.Ed.2d 435 (1965). *See*

also *Norbay Music, Inc. v. King Records, Inc.*, 290 F.2d 617, 620 (2d Cir.1961) (failure to cure defaults in the payment of royalties held to constitute acts of infringement under the 1909 Act); *Essex Music, Inc. v. ABKCO Music Records, Inc.*, 743 F.Supp. 237, 241 (S.D.N.Y.1990) ("it is beyond dispute that non-payment of royalties can constitute copyright infringement").

 However, it is the composer, and not LAMCO/ACEMLA, that have the standing to bring a rescission claim or copyright infringement claim against Plaintiffs. "'When a composer assigns copyright title to a publisher in exchange for the payment of royalties, an equitable trust relationship is established between the two parties which gives the composer standing to sue for infringement of that copyright. *Manning v. Miller Music Corp., supra*, 174 F.Supp. at 195–97; *Alexander v. Irving Trust Co.*, 132 F.Supp. 364, 369 (S.D.N.Y.), *aff'd*, 228 F.2d 221 (2d Cir. 1955), cert. denied, 350 U.S. 996, 76 S.Ct. 545, 100 L.Ed. 860 ...; *Hoffman v. Santly–Joy, Inc.*, 51 F.Supp. 778, 778–79 (S.D.N.Y.1943)."' *Cortner v. Israel*, 732 F.2d 267, 271(2d Cir.1984) (quoting *Norbay Music*, 290 F.2d at 620). Defendants at most have presented a potential defense to Plaintiffs copyright infringement claims. However, Defendants' do not have standing for this claim in this case. *See Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 32 (2d Cir.1982) ("The Copyright Act authorizes only two types of claimants to sue for copyright infringement: (1) owners of copyrights, and (2) persons who have been granted exclusive licenses by owners of copyrights. Fn. 3. 17 U.S.C. § 501(b) (Supp. IV 1980); 3 M. Nimmer, NIMMER ON COPYRIGHT § 12.02, at 12–25 (1982)."). *See also Plunket v. Doyle*, No. 99 Civ. 11006(KMW), 2001 WL 175252, at *5 (S.D.N.Y., Feb. 22, 2001). Footnote three in the *Eden Toys* case is helpful.

Eden apparently believed that a third basis for standing under the Copyright Act existed, namely authorization by the copyright holder of suit by a person other than an exclusive licensee. Clause 9 of the 1975 Eden/Paddington agreement, *quoted supra* note 2, contemplates such an arrangement. *We do not believe that the Copyright Act permits holders of rights under copyrights to choose third parties to bring suits on their behalf.* While FED. R. CIV. P. 17(a) ordinarily permits the real party in interest to ratify a suit brought by another party, *see Urrutia Aviation Enterprises v. B.B. Burson & Associates, Inc.*, 406 F.2d 769, 770 (5th Cir.1969); *Clarkson Co. Ltd. v. Rockwell Int'l Corp.*, 441 F.Supp. 792 (N.D.Cal.1977), the Copyright Law is quite specific in stating that only the "owner of an exclusive right under a copyright" may bring suit. 17 U.S.C. § 501(b) (Supp. IV 1980).

*Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d at 32 n. 3 (emphasis added). *See also ABKCO Music, Inc.*, 944 F.2d at 980 (Copyright Act does not permit copyright holders to chose third parties to bring suits on the behalf); *Bourne Co. v. Hunter Country Club, Inc.*, 990 F.2d 934 (7th Cir.), *cert. denied*, 510 U.S. 916, 114 S.Ct. 308, 126 L.Ed.2d 256 (1993). The Court agrees with this analysis; the composers are the proper parties.

Additionally, under the 1976 Act, a copyright owner that has not received royalty payments may terminate the compulsory license upon thirty (30) days notice. *Essex Music, Inc. v. ABKCO Music Records, Inc.*, 743 F.Supp. at 242; 17 U.S.C. § 115(c)(5). "After the thirty days expires, the making or the distribution, or both, of all phonorecords for which the royalty has not been paid [is] actionable as

acts of infringement." 17 U.S.C. § 115(c)(5); *Essex Music,* 743 F.Supp. at 242.[18] *See also Peer Int'l Corp. v. Luna Records, Inc.,* 887 F.Supp. 560, 566 (S.D.N.Y.1995) (same). Defendants have produced no evidence that any composer took these steps.[19]

**OTHER DEFENSES OF DEFEN-DANTS**

Another defense of Defendants is that § 205(d) of the 1976 Act gives them priority over Plaintiffs because Plaintiffs failed to record (at least many) of their transfers. Defendants' next defense has been that Plaintiffs, in many of the musical compositions, have no rights because the contracts granting them rights have expired ("exclusive rights contracts"). Defendants' final defense has been that Plaintiffs' renewals do not bear the signature of the composer, but rather a forgery signed by Plaintiffs.[20] At oral argument, Defendants admitted that they were mistaken as to the exclusive rights contracts and the signatures, and the Court agrees that they were mistaken.

Defendants now admit that they "misconstrued" the exclusive rights contracts. However, rather that giving up while they are behind, Defendants try a new angle; that the exclusive rights contracts are so difficult to understand that they are null and void. Such an accusation is ridiculous.[21]

Defendants' defense based upon the "forgeries" is equally ridiculous, a point that Defendants now agree with. Plaintiffs, possessing power-of-attorney, had the right and power to sign the renewals on the composers behalf (as the contracts specifically allowed). *See Tobias v. Joy Music, Inc.,* 204 F.Supp. 556, 559 (S.D.N.Y.1962). The Court will say no more about it.

Defendants' main defense, and now the only on remaining, centers on § 205(d) of the 1976 Act. The Court has previously discussed this section, both above and in a prior Opinion & Order (*Latin American Music Co., Inc. v. Archdiocese of San Juan of the Roman Catholic Apostolic Church,* 135 F.Supp.2d 284, 297–98 (D.P.R.2001)). The same reasoning holds here:

> While the presence or absence of "good faith" is an issue of fact for a jury, constructive notice may be determined at the summary judgment stage as an issue of law. "A copyright registration certificate issued by and filed with the Copyright Office serves to put the world on constructive notice as to the ownership of the copyright and the facts stated in the registration certificate." *Saenger Org. v. Nationwide Ins. Lic. Assocs., Inc.,* 119 F.3d 55, 66 (1st Cir.1997). *See Epoch Prod. Corp. v. Killiam Shows,*

---

18. Non payment of royalties was also actionable under the 1909 Act. *See, e.g., Shapiro, Bernstein & Co. v. Gabor,* 266 F.Supp. 613, 614 (S.D.N.Y.1966).

19. The Court, however, directs the special master to inquiry into these allegations.

20. Defendants also try to exclude many of Plaintiffs documents from consideration, arguing that they are inadmissible. Defendants are wrong. The documents are admissible under the Business Records portion of the Federal Rules of Evidence. *See* FED. R. EVID. 803(6).

21. The Court has read sample contracts of these exclusive rights contracts as well as case law and treatise which discuss the issue. None of the authorities were hard to find and their explanations were even simpler. A reasonable party would have understood the exclusive rights contracts to be an agreement between the author and publisher to grant any songs' rights written by that author during the contract term to the publisher. This is the clear language of the contracts.

*Inc., et al.,* 522 F.2d 737, 740 n. 2 (2d Cir.1975), *cert. denied,* 424 U.S. 955, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976) (stating that registration records the claim of ownership). LAMCO/ ACEMLA thus had constructive notice of the ownership of "Patacón Pisa'o'" by Música Unica. Furthermore, ASCAP's "chain of title from the author is presumed by reason of the registration certificate where [a party] obtained an assignment of rights prior to registration." 4[ ] NIMMER ON COPYRIGHT, § 13.01[A].

*Id.,* 135 F.Supp.2d at 300. Defendants had constructive notice of Plaintiffs' ownership in this case. *See infra.* n. 13.

Furthermore, Plaintiffs, in many instances, are the original statutory owners of the copyrights at issue.[22] As such, these were not transfers that fall under § 205(d)'s recording provision. *See Makedwde Publ'g Co. v. Johnson,* Civ. A. No. 91–0879, 1992 WL 125428 (E.D.La., May 19, 1992) ("Under the Copyright Act of 1909, the assignee of an author's common law copyright in an unpublished work may obtain an initial statutory copyright.") (citations and footnotes omitted). *See also Jerry Vogel Music Co. v. Warner Bros.,* 535 F.Supp. 172, 175 (S.D.N.Y.1982); *Urantia Found. v. Maaherra,* 114 F.3d 955, 960 (9th Cir.1997); *Self–Realization Fellowship Church v. Ananda Church of Self–Realization,* 206 F.3d 1322, 1325 (9th Cir. 2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 881, 148 L.Ed.2d 790 (2001); *American Vitagraph, Inc. v. Levy,* 659 F.2d 1023, 1026 (9th Cir.1981).

**SPACEM CONTRACTS**

■ Defendants admit leaving the SPACEM songs in their catalog by accident. Of course, scienter need not be shown to prove copyright infringement. *See Fitzgerald Publ'g Co., Inc. v. Baylor*

*Publ'g Co., Inc.,* 807 F.2d 1110, 1113 (2d Cir.1986). Since Defendants admit leaving the SPACEM songs on their list by accident, the Court finds that Defendants may have infringed upon Plaintiffs' copyrights. *See, e.g., Hotaling v. Church of Jesus Christ of Latter–Day Saints,* 118 F.3d 199, 203 (4th Cir.1997) (Library operator's act of adding work to library's collection, listing work in library's index or catalog system, and making work available to borrowing or browsing public constituted "distribution" of work within meaning of Copyright Act). Plaintiffs have satisfied the first requirement by proving ownership. The Court will wait until the special master reviews whatever further evidence and argument the parties may submit before any conclusion regarding infringement.

**IT IS SO ORDERED.**

---

**22.** Plaintiffs attached a chart of the 412 com- positions that fall into this category.